## COMMONWEALTH vs. FREDERICK STOREY, JR.

Hampden. April 2, 1979. — June 25, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Identification. Arrest. Probable Cause. Evidence, Relevancy. Practice, Criminal, Argument by prosecutor. Homicide.*

There was no merit to a criminal defendant's contention that a pretrial identification of the defendant by a witness in a one-on-one showup by the police was so unnecessarily suggestive and unreliable that it should have been suppressed. [316-320]

At a criminal trial, there was sufficient evidence to warrant a finding that the police had probable cause to arrest the defendant. [320-322]

At a murder trial, the judge did not err in admitting in evidence a revolver seized from the defendant's apartment even though the gun was not directly proved to be the murder weapon. [322-323]

Comments by a prosecutor during his closing argument were not so prejudicial as to require reversal of the defendant's conviction. [323-325]

At a murder trial, there was sufficient evidence to warrant a finding that the defendant had killed the victim with malice and deliberate premeditation even though there were no eyewitnesses to the crime. [325-326]

INDICTMENT found and returned in the Superior Court on October 15, 1976.

The case was tried before *Tisdale*, J.

*Stephen W. Silverman (Greg T. Schubert* with him) for the defendant.

*William T. Walsh, Jr.*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. On the afternoon of September 15, 1976, Brenda Wilson was fatally shot in her home at 186 Nursery Street in Springfield. Indicted for her death, the defendant, Frederick Storey, Jr., was convicted of murder in the first degree by a Superior Court jury. The defend-

ant now appeals, pursuant to G. L. c. 278, §§ 33A-33G, claiming that errors were committed both in the police investigation of the crime and during the course of his trial. We find no merit in any of the defendant's contentions. Accordingly, we affirm his conviction.

We summarize the evidence as it was presented at trial. About 5:40 P.M. on September 15, 1976, the victim, Brenda Wilson, was found dead, lying on the floor near the side of her bed, by Sandra Crump, a close friend who had come to visit. The police were called to the scene of the crime as was Dr. William Mosig, the medical examiner for the Second Hampden District. Dr. Mosig's examination and later autopsy revealed that Wilson's death occurred somewhere between noon and 2 P.M. on the fifteenth of September. He observed three gunshot wounds in the victim's head and two in her chest, and, on the basis of the wounds, Dr. Mosig concluded that one of the fatal bullets had entered the victim's body while she was "laying [*sic*] horizontally, probably on her back."

The prosecution's case against the defendant consisted exclusively of circumstantial evidence. Willie J. Thomas, a tenant relations advisor for the Springfield Housing Authority, identified the defendant, both out of court and at trial, as having been seated at a table in the victim's kitchen about noon on the day of the crime. According to his testimony, he, Thomas, had entered Wilson's apartment shortly after inspecting a vacant apartment located below the victim's, in order to use the kitchen telephone to report to his office. Standing approximately three and one-half to four feet from a man seated at the table, Thomas's attention was drawn to the man by his intensely distressed demeanor.[1] By his own estimate, Thomas was in the apartment approximately four to five minutes.

---

[1] "He never smiled, there was a scowl on his face [despite] the fact that he was playing with a child. Usually I associate playing with a child and a smile and happiness, that did not occur," Thomas stated.

Following the discovery of the victim's body, Thomas gave a description to the police of the man seen in the apartment.[2] On the same day, later in the evening, Thomas was shown a number of photographs of individuals roughly matching his description of the suspect. A photograph of a certain man was selected, but, on viewing this individual face to face, Thomas determined that he was not the man whom he had seen in the victim's kitchen.[3] On the sixteenth of September and again on the seventeenth, Thomas viewed several additional trays of photographs and subsequently identified Storey from an array of nine photographs as the man in the apartment. In consequence, two police officers were dispatched to Storey's place of employment, the Smith & Wesson plant outside Springfield, in order to ask the defendant to come to police headquarters. Storey acceded to the officers' request, and at the station house Thomas viewed the defendant standing by himself, opposite a glass door of an adjoining room, and positively identified him as the man he had seen in the apartment on the day of the crime. This identification was repeated minutes later in the defendant's presence and again in court. Corroborating Thomas's identification of Storey at trial was the testimony of another witness, Russell Flack, who, while unable to identify the defendant positively, stated that between 12:30 P.M. and 1 P.M. on the day of the crime he heard gunshots and observed a person fitting the defendant's description leaving the area of the victim's building.

Storey was formally arrested after Thomas identified him at police headquarters. Captain James F. Williams of the Springfield police promptly read the defendant his

---

[2] Thomas described the man he had seen as being five feet, nine inches tall, 175-180 pounds; as having a "pop gut," full mustache, and hair cut short; and as wearing a blue midwaist jacket and medium gray cotton pants.

[3] Thomas found the suspect to be heavier and to have longer hair than the man he witnessed at the murder scene.

Miranda rights and then questioned him as to whether he had fired a gun within the past two weeks. Storey admitted, Williams testified at trial, to having fired a gun in the basement of his home. Storey also admitted, Williams stated, to having had a sexual affair with the victim.

As a result of these admissions, a search warrant was obtained for Storey's home, where a .38 caliber Smith & Wesson revolver was found between the mattress and box spring of his bed, and nine unfired .38 caliber cartridges, with nickel plated casings and round-nosed, copper-jacketed projectiles, were discovered in an inside pocket of a suit belonging to the defendant.[4] Over the defendant's objection, the gun and bullets were introduced in evidence at trial. A prosecution ballistics expert, Corporal George Windisch,[5] provided testimony that the defendant's gun, which was of the same caliber as the murder weapon, had been fired at least two times from two charge holes. Although Windisch was unable to identify the gun as the murder weapon (due to extensive damage to the spent projectiles found at the murder scene and recovered from the victim's body), the witness was able to match the type of bullets found in the defendant's coat to those discovered at the murder scene. Most significantly, Windisch stated that he had never previously encountered such bullets — bullets having a projectile with a round copper nose and a lead base — during his five and one-half years' experience and through thousands of examinations similar to those conducted here.

Two representatives of the defendant's employer, the Smith & Wesson company, were also called as witnesses by the prosecution. Robert Allen, wage and salary administrator of the plant, testified that Storey worked the 3 P.M. to 11 P.M. shift and was assigned the task of putting

---

[4] The specific location of these objects had been provided by Storey himself.

[5] Windisch, at the time of trial, was an officer in the Massachusetts State police assigned to the Firearms Identification Section.

stocks on revolvers. James Isom, serial administrator for all firearms manufactured by Smith & Wesson, stated that the company did not possess a record of a final disposition of the revolver found in the defendant's home, which indicated, he explained, that the gun had not been sold by the company.[6] In defense, Storey called a single witness, Carl Majesky, a private investigator and formerly a supervisor of the Firearms Identification Section of the State police, who offered the opinion that the bullets found at the crime scene and those found in the defendant's coat were not unusual.

On appeal, Storey advances five arguments which he suggests warrant setting aside the jury verdict finding him guilty of murder in the first degree: (1) that Thomas's identification of the defendant was unnecessarily suggestive and so unreliable that it should have been suppressed; (2) that statements made by the defendant to the police should have been suppressed because they resulted from an arrest without probable cause; (3) that the trial judge erred in admitting in evidence the defendant's gun without a curative instruction indicating that it had not been proved to be the murder weapon; (4) that the prosecutor addressed improper remarks to the jury in his closing argument; and (5) that the Commonwealth failed to prove premeditation beyond a reasonable doubt. Because we are unpersuaded by all the defendant's arguments, we conclude that the conviction should not be disturbed.

1. *Thomas's identification of Storey.* We turn initially to the defendant's contention that his identification by Thomas should have been suppressed because it was unnecessarily suggestive. The gravamen of the defendant's argument is that the use of a one-on-one showup by the police is improper where no exigent circumstances exist

---

[6] This conflicted with Storey's statement, offered immediately following his arrest, that he bought the gun and ammunition from an unknown seller in New Jersey two weeks earlier.

to excuse or justify the failure to employ an available lineup facility. Since the police had ample time and adequate physical facilities to conduct a lineup to determine if Thomas could identify the defendant, the defendant contends that the police erred in utilizing a less formal showup procedure.

We disagree. As has been frequently suggested by this court and others, one-on-one confrontations, whether photographic or in person, while often disfavored, are not subject to a rule of per se exclusion. *Commonwealth* v. *Venios, ante* 24, 29 (1979). *Commonwealth* v. *Jackson,* 377 Mass. 319, 332 (1979). *Commonwealth* v. *Nolin,* 373 Mass. 45, 51 (1977). *Nassar* v. *Vinzant,* 519 F.2d 798, 801 (1st Cir. 1975). *State* v. *Middleton,* 170 Conn. 601, 606 (1976). Although such confrontations pose particularly serious dangers of suggestiveness, we would consider it ill advised to exclude as constitutionally unacceptable all evidence that has been derived from single person confrontations simply because these identification procedures might have taken place just as easily in the form of lineups. See *Commonwealth* v. *Chase,* 372 Mass. 736, 743-744 (1977); *Commonwealth* v. *Bumpus,* 354 Mass. 494 (1968). But see *Biggers* v. *Tennessee,* 390 U.S. 404 (1968) (Douglas, J., dissenting). Rather, the test to be applied in measuring the constitutional sufficiency of single person confrontations under the due process clause is simply whether the confrontation is unnecessarily suggestive of the defendant. *Commonwealth* v. *Venios, supra* at 26-27. *Commonwealth* v. *Dougan,* 377 Mass. 303, 315-316 (1979). *Commonwealth* v. *Marini,* 375 Mass. 510, 519 (1978). *Commonwealth* v. *Botelho,* 369 Mass. 860, 867 (1976). See *Moore* v. *Illinois,* 434 U.S. 220, 227 (1977); *Simmons* v. *United States,* 390 U.S. 377, 384 (1968); *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967).

Applying this standard to the case before us now, we are aware of no reason to believe that the pretrial identification of the defendant by Thomas was in any way

unnecessarily suggestive.[7] During parts of three days pri-
or to and including the day he identified the defendant,
Thomas viewed photographs of potential suspects. On the
night of September 15, the day of the crime, he examined
an estimated fifty photographs; the following day he
viewed several additional trays of photographs; and final-
ly, on September 17, he selected a picture of the defend-
ant from an array of nine photographs. No claim has been
made that the photograph of the defendant was present-
ed in such a way as to suggest the defendant was suspect-
ed of the crime by the police. Compare *Commonwealth* v.
*DeBrosky*, 363 Mass. 718 (1973), with *Commonwealth* v.
*Kazonis*, 356 Mass. 649 (1970). Moreover, we can assume
from the deliberate manner in which the witness scanned
photographs over this three-day period that the police
exerted no pressure on Thomas to select hastily the
photograph of the defendant. That the police refrained
from attempting to influence Thomas's identification
would seem to be indicated by the fact that, after Thomas
made a tentative identification of the man believed to
have been in the victim's apartment, he evidently felt
free to reject his own earlier determination. Additionally,
there is no hint in the record that the "in person" con-
frontation between the witness and the defendant was
improperly suggestive. Indeed, the record indicates that
the police said nothing to Thomas regarding the defend-
ant during the period between the witness's selection of
Storey's photograph and the time when that identifica-
tion was verified by the one-on-one station house showup.

Although we recognize that informal identification
procedures, whether they occur at the scene of the crime
or in the station house, can be both constitutionally per-
missible and useful tools of criminal investigation, see
*Commonwealth* v. *Alicea*, 376 Mass. 506, 514-515 (1978);
*Commonwealth* v. *Barnett*, 371 Mass. 87, 93 (1976), cert.

---

[7] We note with regret that the judge made no findings of fact in
denying the defendant's pretrial motion to suppress Thomas's identifi-
cation.

denied, 429 U.S. 1049 (1977), our approval of these techniques is strongly qualified by the observation that prosecutors, and the public they represent, may often stand to benefit at trial through the use of formal identification techniques which are more easily viewed as inherently fair and accurate. *Commonwealth* v. *Botelho, supra* at 874. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 791 (1977). As Judge Carl McGowan has noted, "[a]n identification made at a lineup with counsel present is more likely to impress the jury than any number of vehement assertions from the witness stand that the defendant is the man." McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L. Rev. 235, 241 (1970).[8]

Since we are convinced that the identification procedure used by the police in the instant case may be upheld under an approach which considers the suggestiveness of the confrontation, we need not decide here whether we will follow the usually more lenient "reliability" standard in determining the admissibility of identification evidence in cases where an improperly suggestive confrontation has occurred.[9] Similarly, because we hold that the pretrial identifications of the defendant were not consti-

---

[8] Weaknesses in identification procedures, of course, may be considered by the jury in its determination of the weight of the identification. *Commonwealth* v. *Jones*, 375 Mass. 349, 355 (1978). *Commonwealth* v. *Funderberg*, 374 Mass. 577, 581-582 (1978).

[9] See *Manson* v. *Brathwaite*, 432 U.S. 98, 114 (1977). Under the rule of *Manson*, the reliability of the witness is the "linchpin" in determining the admissibility of identification evidence. This court has yet to address a case squarely raising the question whether reliable identification evidence could be admitted where an unnecessarily suggestive confrontation has taken place. *Commonwealth* v. *Rodriguez, ante* 296, 304-305 (1979). *Commonwealth* v. *Venios, ante* 24, 27-28 (1979). Cf. *State* v. *Cefalo*, 396 A.2d 233, 236-240 (Me. 1979). As we advised in *Venios, supra* at 28, however, "judges who must make findings with respect to challenged identification procedures should direct their attention to the issues framed by our prior cases as well as to the 'reliability test.' " See *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972), for a recital of factors germane to reliability.

tutionally infirm, we need not consider if Thomas's in-court identification was adequately based on observations of Storey independent from any improper pretrial identification procedure. See *Commonwealth* v. *Clifford,* 374 Mass. 293 (1978). See generally *Commonwealth* v. *Venios, supra* at 30.

2. *Probable cause.* The defendant next argues that his arrest in the station house, following the in-person identification of him by Thomas, was unsupported by probable cause. In consequence, he contends, all evidence obtained as a result of the arrest — most particularly the admissions he made to Captain Williams, and the gun and bullets found in his home — should have been excluded at trial. See *Brown* v. *Illinois,* 422 U.S. 590 (1975). Cf. *Commonwealth* v. *Alicea, supra* at 512. Although it is conceded that this issue is presented for the first time here and that no probable cause hearing was ever requested below, the defendant nevertheless seeks our review, citing the broad powers granted this court under G. L. c. 278, § 33E.

The defendant's argument is weakened, and our task is made more difficult, by the defendant's failure to raise the issue at trial. When a matter so central to the Commonwealth's case against a criminal defendant as the existence of probable cause is belatedly raised, it may be argued that the contention is either frivolous or a recognition of poor trial tactics. See *Commonwealth* v. *Johnson,* 374 Mass. 453, 465 (1978). Moreover, without the benefit of a record from a lower court hearing addressed to the specific issue, an appellate court is ill equipped to determine questions such as the one presented here — viz., whether a police officer had probable cause to arrest the defendant. Because hearsay that is admissible for purposes of probable cause determinations, see *Commonwealth* v. *Lehan,* 347 Mass. 197 (1964), will often be inadmissible — if not immaterial or irrelevant — at trial, the trial record alone may never present a truly accurate reflection of the arresting officer's state of mind. A trial

transcript standing by itself is thus an inadequate substitute for the record of a full hearing on the matter prior to the commencement of trial.

Despite the handicap posed by the defendant's failure to raise this issue earlier, we still are able to find, on the basis of the trial transcript and of the transcript of the hearing of the defendant's motion to suppress Thomas's identification, sufficient evidence that the police had probable cause to arrest Storey. As the standard is most often formulated, probable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense. *Commonwealth v. Haas*, 373 Mass. 545, 555 (1977). *Commonwealth v. Le-Blanc*, 373 Mass. 478, 486 (1977). *Commonwealth v. Snow*, 363 Mass. 778, 788 (1973). *Commonwealth v. Andrews*, 358 Mass. 721, 723 (1971). *Beck v. Ohio*, 379 U.S. 89 (1964). 1 W.R. LaFave, Search and Seizure § 3.4 (1978).

We believe that this test was met by Thomas's positive identification of the defendant as the man he saw seated in the victim's kitchen shortly before the time of Wilson's death, see *Commonwealth v. Boswell*, 374 Mass. 263, 267 (1978), coupled with the absence of any evidence of other suspects, such as an intruder,[10] see *Commonwealth v. Haas*, 373 Mass. 545, 568-569 (1977) (Hennessey, C.J., concurring in part, dissenting in part). In brief, trustworthy evidence[11] made it clear that an offense had been commit-

---

[10] Sergeant William Fitchet of the Springfield police department, one of the officers who was sent to the victim's house after Sandra Crump discovered her body, testified that the house was in good order and that there was no evidence of a burglary.

[11] Thomas was a respected member of the community, a tenant-relations advisor for the Springfield Housing Authority, who supervised an estimated 1,200 apartments. At midday on the day of the crime, he had opportunity to observe the man he subsequently identified as the defendant from no more than five feet away. During this view, he paid rapt attention to this individual, who he said was seated at the victim's kitchen table. Then, at police headquarters, he exhibit-

ted and that one particular person had been on the scene at or near the time of its commission. See *United States* v. *Cooperstein*, 221 F. Supp. 522, 526 (D. Mass. 1963). Although our examination is unfortunately truncated, we think it yet possible to conclude that the police had ample justification to believe that Storey "more probab[ly] than not" had killed the victim. See *Commonwealth* v. *Cruz*, 373 Mass. 676, 684-685 (1977).

3. *Admission in evidence of the defendant's gun.* The defendant further maintains that the introduction in evidence of the revolver seized from his apartment was erroneous because the gun was not directly proved to be the murder weapon and because its introduction was not accompanied by appropriate limiting instructions.

We discern no error. The gun was correctly admitted in evidence because it was clearly relevant to show that the defendant had readily available means of committing the offense. *Commonwealth* v. *Watkins*, 375 Mass. 472, 491 (1978). *Commonwealth* v. *Roach*, 108 Mass. 289 (1871). See 1 C. Torcia, Wharton's Criminal Evidence § 157 (13th ed. 1972). Whether or not the gun in question was in fact the murder weapon was an issue the jury surely understood.

The cases cited by the defendant, *Commonwealth* v. *Ellis*, 373 Mass. 1 (1977), and *Commonwealth* v. *Russell*, 2 Mass. App. Ct. 293 (1974), do not speak to the facts of the instant case. In both of these cases, unlike here, the prosecution admitted that the murder weapon had not been recovered. In order to provide a display for the jury, specially purchased firearms, similar to those alleged to have been used in the crime, were introduced in evidence. Because these guns bore no connection to the defendants, limiting instructions were deemed necessary to mitigate

---

ed marked deliberation in choosing the photograph of the defendant as the man seen in the victim's apartment. Finally, in confronting the defendant — only two days after the crime — Thomas identified Storey without equivocation.

the unfairness of the firearms' obviously prejudicial effects.

4. *Unfair prosecution argument*. The defendant also challenges two aspects of the prosecutor's closing argument to the jury as unfair and prejudicial. First, Storey alleges that the prosecutor made impermissible comments concerning his refusal to testify and his motives in exercising his right to trial by jury. Secondly, the defendant asserts that the prosecutor attempted to fill "a vital missing link" in his case by stating certain facts not in evidence. Although the defendant neither objected nor excepted to these incidents, we nonetheless consider it proper, given our powers of review in capital cases under § 33E, "to examine the alleged prejudicial statements against the background of the entire case to determine if a miscarriage of justice has occurred." *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 314 (1973). However, on close viewing of the alleged prosecutorial improprieties in the content of the trial, we are unable to find anything so egregious as to require reversal of the defendant's conviction.

The defendant's first claim of prosecutorial misconduct focuses on two particular remarks. In one, the prosecutor rhetorically asked the jury, "[H]ave you heard word one from the defendant as to what took place down at the police station?" In the other, the prosecutor said the following: "We told you at the beginning of this case that the Commonwealth could not bring a man in and say, yes, ladies and gentlemen of the jury, that bullet taken from that young lady's body was fired from this defendant's gun. Do you think we would be here today if we could have said that? Do you think we could have had a trial? Of course not, we wouldn't have had a trial." While we agree that both comments would have been better left unsaid, neither in our opinion reaches the level of condemnation achieved by prosecutorial remarks in cases like *Commonwealth* v. *Shelley*, 374 Mass. 466 (1978), *Commonwealth* v. *Burke*, 373 Mass. 569 (1977), or *Common-*

*wealth* v. *Haas*, 373 Mass. 545 (1977). As read in the context of the entire argument, we think that the first remark was directed more at the general weakness of Storey's defense than toward the defendant's own failure to testify. Cf. *Commonwealth* v. *Costello*, 5 Mass. App. Ct. 838 (1977); *Commonwealth* v. *Morrison*, 1 Mass. App. Ct. 632 (1973). With regard to the second remark, we question whether it was prejudicial at all. In any event, we are satisfied that the brief, indeed fleeting, nature of these comments, together with clear instructions by the judge that opening and closing statements are not evidence, see *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571 (1976); *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 536-538 (1971), prevented these remarks from having an impact on the jury's verdict.

The defendant also contends, however, that the prosecutor abused the standards of fair closing argument by stating facts not in evidence—namely, that Russell Flack had signed a pretrial statement in which he identified the defendant as the man he saw leaving the victim's building. It is, of course, beyond dispute that a prosecutor commits error when he uses closing argument to argue or suggest facts not previously introduced in evidence. *Commonwealth* v. *Shelley, supra* at 470. *Commonwealth* v. *Johnson*, 374 Mass. 453, 459 (1978). But the prosecutor's statement that the defendant challenges was based essentially on Flack's own trial testimony, not on matters extraneous to the trial. Flack, in fact, had signed a statement identifying a specific individual, and he indicated at trial that he had done so. When Flack failed to make an in-court identification of Storey, the prosecutor evidently believed that the members of the jury deserved an explanation, because they had been promised in opening argument that Flack would identify the defendant during the course of the trial.[12] In these circumstances it appears

---

[12] In relevant excerpt, the prosecutor said in closing argument: "I did default on one aspect in this case, and it has bothered me that I

plain that the prosecutor's motives were proper. The prosecutor was not attempting to deceive the jury by misrepresenting the evidence introduced during the trial.[13] The prosecutor's objective, as revealed in the context of his closing argument, was simply to defend his credibility, and that of his case, by pointing out contradictions and inconsistencies in the witness's testimony. Cf. *Commonwealth* v. *Reddick*, 372 Mass. 460 (1977).

5. *Premeditation; § 33E*. Finally, as an alternative disposition, the defendant urges us to invoke our § 33E powers to reduce his conviction to murder in the second degree. Storey predicates his application on the contention that the evidence presented at trial could not support a finding of "deliberately premeditated malice aforethought." See *Commonwealth* v. *McInerney*, 373 Mass. 136 (1977).

We reject the defendant's argument. In our judgment, the trial produced sufficient evidence from which a jury

---

have defaulted on that aspect of that case, that is when I told you I was going to bring a witness in here, Mr. Rusty Flack, who would come in and tell you that he had identified a man, known to him on prior occasions, exiting from the crime scene moments after he heard the two shots. And I defaulted on that, because you saw Mr. Rusty Flack come in here and I asked him the preliminary questions: 'Did you see a man?' 'Yes.' 'Would you look around this courtroom and pick this man out?' He stated that — he looked around the courtroom, he says, 'No, I can't pick him out.' And I defaulted, that is the fellow I was going to bring in here to show you that this defendant had exited that building from that building area moments after the firing of those two weapons — two gunshots. Then I said to Mr. Flack, 'Well, wait a minute, now, you gave a statement to the police on August 17, 1977, where you named a person known to you exiting from that apartment.' 'Yeah, that's right,' he said, 'yes, I did name the man to the police.' That's what I based my contract on; he named the man to the police."

[13] Although the evidence introduced before the jury did not disclose that Flack in his statement had identified the defendant as the man seen, we have examined, by agreement of the parties, a copy of that statement and it establishes that the prosecutor could reasonably have expected Flack to provide an in-court identification of the defendant. Flack specifically identified the defendant in the statement given the police.

could conclude beyond a reasonable doubt that the defendant had killed the victim with malice and deliberate premeditation. Evidence was received that the victim was shot more than once, see *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974), and that a fatal shot entered her body while she was lying on her back. Accordingly, the jury could reasonably have inferred that the victim had been inflicted with a mortal wound after she had been felled and rendered helpless. Such facts are legally sufficient to prove premeditation. See 1 C. Torcia, Wharton's Criminal Evidence § 135 (13th ed. 1972).

The facts of this case, we think, may be viewed as roughly similar to those in *Commonwealth* v. *Stirling*, 351 Mass. 68 (1966). In that case, as here, there were no eyewitnesses to the crime. However, in *Stirling* we held — and we do so herein — that the chain of circumstantial evidence was so strong that it could properly persuade a jury of the defendant's guilt. See *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 490 (1977). But see *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965).

In conclusion, our examination of the entire record pursuant to this court's duty under § 33E reveals no reason in justice why we should disturb the jury verdict.

*Judgment affirmed.*