COMMONWEALTH *vs.* JERRY WORLDS.

Worcester.  September 11, 1979, January 10, 1980. — February 13, 1980.

Present:  GRANT, BROWN, & DREBEN, JJ.

*Identification.*

At the trial of an indictment for armed robbery the evidence warranted the judge's finding that the defendant had not sustained his burden of proving that the viewing of photographs from which the victim and another witness identified the defendant had been impermissibly suggestive; the fact that their identifications occurred after an earlier, permissible confrontation did not deprive the defendant of due process of law.  [166-168]

Where a judge's finding that the victim of an armed robbery had an adequate opportunity to observe his assailants was supported by evidence, a one-on-one stationhouse confrontation was not impermissibly suggestive.  [168-171]

A joint one-on-one confrontation at a police station, leading to identifications of a defendant by both the victim and another witness as the perpetrator of an assault and an armed robbery, was, in the circumstances, impermissibly suggestive as to the other witness and was unreliable under the test enunciated in *Neil* v. *Biggers,* 409 U.S. 188, 199-200 (1972), and *Manson* v. *Brathwaite,* 432 U.S. 98, 113-114 (1977), where there was no evidence to support findings that the witness remained attentive throughout the assault and viewed his assailants long enough to fix their identities in his mind [168-172]; in the absence of clear and convincing evidence that the witness's anticipated in-court identification would be based on a source independent of the stationhouse confrontation, the in-court identification should have been suppressed [172].

INDICTMENT found and returned in the Superior Court on January 5, 1978.

A pretrial motion to suppress evidence was heard by *Garbose, J.*, a District Court judge sitting under statutory authority, and the case was tried before him.

*Beth H. Saltzman* for the defendant.

*Lynn Morrill Turcotte,* Assistant District Attorney, for the Commonwealth.

GRANT, J. The defendant has appealed from his conviction on an indictment for armed robbery, urging error in the denial of his motion to suppress all pretrial and anticipated in-court identifications of himself by the alleged victim of the robbery (Lee) and by one King. The following is a summary of the relevant evidence adduced at the hearing on the motion.

Shortly after midnight on July 30, 1977, Lee and King arrived in Lee's automobile at a disco located on Chandler Street in Worcester. They parked in a lot behind the disco and were walking down a driveway toward Chandler Street when they encountered two black males. The two blacks taunted and then assaulted them; a third black male joined the assault while two others acted as lookouts. Altogether, the incident lasted twenty to twenty-five minutes, during which time Lee and King were knocked to the ground, beaten, kicked and robbed. One assailant placed a knife to Lee's throat, forced him to open his automobile, and took a tape deck found therein. The assailants then fled.

The lighting at the scene of the incident was dim, consisting of lights on the porches of a neighboring hotel, lights on the wall of another building, and a street light some distance away. Nonetheless, Lee was able to observe the two blacks who had initiated the assaults during the entire incident. He observed not only his own assailant but also those assaulting King, about twenty-five feet away. He saw that King had been knocked to the ground and was being kicked in the face and that he continued to lie where he had fallen even after the assailants had fled.

After the assaults had ended, Lee got into his automobile and drove to where King lay. King got in, and the two

drove a short distance to Federal Square, where they en-
countered Worcester Police Officer John Germain.  They
gave him an account of the incident and described their as-
sailants as four or five black males, one of whom was about
six feet tall and wearing a green knit shirt with gold zigzag
stitching on the sleeves and around the neck.

Germain convinced Lee and King to return with him in
his cruiser to the scene of the incident.  They stopped first
on Chandler Street, and Germain asked Lee and King if
they could recognize anyone in a crowd of twenty to twen-
ty-five blacks standing in front of the disco.  When neither
victim recognized anyone, Germain drove to the parking lot
in the rear of the building, where the incident had oc-
curred, and parked on the sidewalk of a driveway leading
from the lot to Murray Avenue.  He observed an automobile
parked on Murray Avenue in which three black males were
sitting and asked Lee and King if they could identify any of
the occupants.  They replied that they could not because
they could not see the occupants clearly.  Germain asked
the three men to get out of their automobile, and when they
had complied again asked Lee and King if they could recog-
nize anyone.  Viewing the three blacks from a distance of
eight to ten feet, approximately fifteen minutes after the
crime, and in lighting similar to that in which they had seen
their assailants, Lee and King both identified one of the
three, the defendant, as having been involved.  They failed
to inform Germain of their identifications in positive terms
because they were fearful of the large number of blacks in
the immediate area.  Germain requested identification
from the defendant but left the scene without taking him in-
to custody.

Two days later, on August 1, Lee and King were summoned
to a police station for the purpose of viewing photographs.
They were shown four books[1] containing approximately one
hundred sixty photographs, some in black and white and some

---

[1] The books were introduced in evidence at the suppression hearing, as was
the photograph of the defendant which both Lee and King selected.

in color but all of them depicting black males. Before displaying the books, the police obtained a black and white photograph of the defendant from another police station and inserted it among the other photographs. Viewing the photographs independently of each other, Lee and King selected three of them as depicting their assailants. Among the three selected was the photograph of the defendant.[2]

On August 4 the police arrested the defendant, took him to a police station, and booked him. Lee and King were again summoned to the station, and were taken together to a room on the second floor. They were told to look around to see if they could recognize anyone. They observed the defendant and positively identified him as one of their assailants. At the time, the defendant was the only black male in the room and was sitting alone in one of several glassed-in cubicles. Though he had telephoned his attorney, she had not yet arrived at the station. Later that afternoon the defendant was formally arraigned.[3]

Some time later Lee and King were again summoned to the station to confront the other two persons whose photographs they had selected. They identified one of those persons as having been involved in the incident but concluded that they had been mistaken in selecting the other photograph.

The judge found that the parking lot confrontation and the photographic identifications were free of suggestiveness. He failed to make a finding with respect to whether the stationhouse confrontation was impermissibly suggestive, but he did make ultimate findings to the effect that the identifications resulting from that confrontation were reliable in light of all the circumstances.[4] At trial, both Lee and King

[2] They also selected two additional photographs as "look-alikes."

[3] The defendant's contention that he was denied his constitutional rights by the decision to display him to Lee and King prior to arraignment and in the absence of his counsel appears to be answered by *Commonwealth* v. *Clifford*, 374 Mass. 293, 301-302 (1978).

[4] The judge denied the motion to suppress in its entirety, without making any findings. The findings which are referred to in this opinion were

identified the defendant as one of their assailants, and both testified to all their pretrial identifications of him.

The proper standard of review of a judge's findings in identification cases has been variously stated, but the correct formulation of its essentials is clear. Where subsidiary findings of fact have been made by a judge on a motion to suppress they will be accepted by an appellate court in the absence of clear error. His resolution of conflicting testimony must be accepted, and his subsidiary findings will not be disturbed if they are warranted by the evidence. *Commonwealth* v. *Murphy,* 362 Mass. 542, 550-551 (1972) (Hennessey, J., concurring). *Commonwealth* v. *Sires,* 370 Mass. 541, 544 n.1 (1976). *Commonwealth* v. *Moon,* 8 Mass. App. Ct. 375, 385, further appellate review granted, 379 Mass. 926 (1979). By contrast, the judge's ultimate findings and his rulings of law, particularly those which are of constitutional dimensions, are reviewable on appeal, although his conclusions are entitled to substantial deference. *Commonwealth* v. *Murphy,* 362 Mass. at 551. *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978).

1. *The parking lot confrontation.* The defendant does not argue that there was anything impermissibly suggestive about the confrontation which occurred in the parking lot. He contends only that there was no identification at that time. The judge found to the contrary, and as that finding was warranted by the evidence we do not disturb it.

2. *The photographic identifications.* The ultimate finding that the photographic identifications were free of suggestiveness is supported by detailed findings of subsidiary facts. The judge found that all the photographs in the books were mugshots contained in mugbooks; that the photograph of the defendant was placed in one of the books prior to their being shown to Lee and King; that the photograph was not placed in a conspicuous position; that it was a

---

made in response to an order issued by this court following the first argument of the appeal. See *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 240 (1978).

black and white photograph but that there were enough other black and white photographs in the books to prevent its being conspicuous for that reason; that it did not differ from the other photographs in any other conspicuous respect; and that Lee and King viewed the photographs independently of each other. Those subsidiary findings are all warranted by the evidence. Although there was conflicting testimony with respect to whether Lee and King viewed the books at approximately the same or at different times, in neither version of the testimony was there anything to suggest that they had viewed the photographs jointly or that they had communicated with each other concerning their respective selections of photographs. Compare *Commonwealth* v. *Cincotta*, 379 Mass. 391, 394 (1979). All the testimony with respect to the time at which the defendant's photograph had been inserted in one of the books and with respect to its position therein supported the judge's findings. The testimony with regard to the similarity of the defendant's photograph to the other photographs in the array supports the findings on that question, and the judge had before him the actual books used and the actual photograph selected. The fact that the defendant's photograph may have differed in some respects from others in the books is not sufficient to establish that the array was suggestive. *Commonwealth* v. *Clark*, 378 Mass. 392, 399-400 (1979).

The burden was on the defendant to prove by a preponderance of the evidence that the viewings had been conducted in an impermissibly suggestive fashion. *Commonwealth* v. *Venios*, 378 Mass. 24, 26-27 (1979). The bulk of his present argument consists of disputing the judge's subsidiary findings, but those findings are supported by the evidence. The defendant also argues that the neutrality of the array was negated by the effects of the prior confrontation in the parking lot. Factually, he may be correct in that contention, but the law is clear that an initial permissible confrontation may be repeated without offending due process. See *Commonwealth* v. *Cox*, 6 Mass. App. Ct. 968, 969 (1979). Compare and contrast *United States* v. *Eatherton*,

519 F.2d 603, 606-609 (1st Cir.), cert. denied, 423 U.S. 987 (1975). The judge was warranted in concluding that the defendant had failed to sustain his burden of proving that the photographic viewings had been suggestive.

3. *The stationhouse confrontation.* The judge found that the stationhouse confrontation was "inherently suggestive due to its one-on-one character."[5] He further found that that confrontation was a "one-on-one showup" and that at the time the defendant was the only black man in the room; that the defendant had consented to the procedure after being allowed to telephone an attorney; and that no action of the police had implicated the defendant as a perpetrator.

The Commonwealth relies on *Commonwealth* v. *Storey*, 378 Mass. 312, 314, 316-318 (1979), in support of its contention that there was nothing impermissibly suggestive about this confrontation. That case did involve a one-on-one confrontation,[6] but the Commonwealth's contention overlooks uncontradicted police testimony, nowhere reflected in the judge's findings, to the effect that Lee and King jointly identified the defendant in the stationhouse. In *Commonwealth* v. *Moynihan*, 376 Mass. 468, 476-477 (1978), the court sustained a judge's finding that a joint viewing of photographs had not been impermissibly suggestive, but it noted the danger of suggestiveness posed by such a viewing and emphasized that it accorded great weight to the favorable conditions under which the witness had observed the perpetrators at the time of the crime, as well as to the short length of time between the crime and the identification. See *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976);

---

[5] It is not clear whether this characterization was intended as a finding that the confrontation was impermissibly suggestive. If it was so intended, the judge would not have been warranted in basing such a finding solely on the one-on-one nature of the showup. *Commonwealth* v. *Storey*, 378 Mass. 312, 317 (1979), and cases cited.

[6] It appears from the transcript of the suppression hearing in that case that the witness, following his photographic identification of the defendant, had been asked to remain in the stationhouse for the purpose of viewing a police suspect and that the defendant was the only black man in the room when he was identified by the witness.

*Commonwealth* v. *Cofield,* 1 Mass. App. Ct. 660, 667 (1974). The court appears to have evaluated the viewing in the *Moynihan* case with reference to the "reliability" test enunciated in *Neil* v. *Biggers,* 409 U.S. 188, 199-200 (1972), and restated in *Manson* v. *Brathwaite,* 432 U.S. 98, 113-114 (1977), while retaining the language of the "suggestiveness" test of *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967), and *Commonwealth* v. *Botelho,* 369 Mass. 860, 866-868 (1976).[7] Accordingly, we analyze the record for indicia that Lee's and King's stationhouse identifications were reliable in light of all the circumstances.

The judge found that those identifications were based on the witnesses' prior clear perceptions of their assailants and were untainted by any suggestiveness in the confrontation procedure. That finding was based on other findings that Lee and King had had adequate opportunities to observe their assailants at the time of the assaults; that they had made no prior errors in description and had not misidentified anyone in the defendant's stead; that they had received no police suggestion that the defendant was a perpetrator; and that they had previously selected the defendant's photograph from a nonsuggestive array. The finding that Lee and King had adequate opportunities to observe their assailants was itself based on findings that the lighting had been adequate for reliable observation; that, despite an eye injury, Lee had not lost sight of his particular assailant; that Lee and King had had their attentions drawn to their assailants prior to the assaults and had remained attentive throughout the twenty- to twenty-five minute duration of the assaults; that neither Lee nor King had been

---

[7] We are aware that the Supreme Judicial Court has said that it has not yet had occasion to decide whether to adopt the Biggers-Manson test. See, e.g., *Commonwealth* v. *Venios,* 378 Mass. at 27-28, 28; *Commonwealth* v. *Cincotta,* 379 Mass. at 397. The factors to be considered under that test are the opportunity each witness had to view his assailant at the time of the crime, the degree of attentiveness of each witness, the accuracy of prior descriptions by each witness, the certainty which each witness displays at the time of the confrontation, and the length of time between the crime and the confrontation. See 432 U.S. at 114.

drunk at the time; and that both Lee and King had been able to observe their assailants for a long enough time in adequate lighting to fix their identities in their respective minds. In view of the particular importance accorded in the *Moynihan* case to the opportunity which a witness has to view the perpetrator at the time of the crime, it is this latter set of findings which is critical.

There is support in the evidence for the findings that Lee's eye injury had not impaired his vision, that neither Lee nor King was drunk, and that both Lee and King had had their attentions drawn to their assailants prior to the assaults; if read in conjunction with the finding that the assailants were viewed for twenty to twenty-five minutes, the finding that the lighting was adequate for reliable observation seems to be warranted. There was evidence to support a finding that Lee remained attentive throughout the assaults and viewed their assailants long enough to fix their identities in his mind, but there was no evidence to support like findings with respect to King. King did not testify at the suppression hearing. There was no evidence from any source as to how long a time elapsed between his having his attention drawn to their assailants and the onset of the assaults, nor was there any evidence as to how far away the assailants were when he first saw them; there was no evidence of the extent to which he was unable to observe their assailants during the assaults, and there was uncontradicted evidence from which it can be inferred that he observed them very little. As already indicated, he had been knocked to the ground and kicked in the face, and he remained prone throughout the assaults. The description of one assailant given immediately after the assaults, even if it is assumed that King rather than Lee supplied the description, was exceedingly vague. The identification of the defendant at the parking lot confrontation is vitiated, so far as its being evidence of the reliability of King's observation, by the fact that Lee participated in that confrontation. On this record, the judge's findings that King had been attentive throughout the assaults and had observed the assailants long

enough to fix their identities in his mind were not warranted by the evidence.

As the judge's finding that Lee had an adequate opportunity to observe his assailants is supported by evidence, the stationhouse confrontation was not impermissibly suggestive as to him under the *Storey* and *Moynihan* cases. But as the evidence was insufficient to warrant a similar finding with respect to King, the confrontation was impermissibly suggestive as to him. It becomes necessary, as a consequence, to apply the "reliability" test in order to determine whether King's stationhouse identification was properly admitted.

Although the various factors which must be considered under that test (see note 7, *supra*) vary in importance according to the circumstances of the particular case, it is agreed that the opportunity to observe at the time of the offense is ordinarily the most important. See, e.g., *Commonwealth* v. *Ross*, 361 Mass. 665, 671 (1972), judgment vacated on other grounds, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied 414 U.S. 1080 (1973); *Commonwealth* v. *Mobley*, 369 Mass. at 896; *Commonwealth* v. *MacMillan*, 5 Mass. App. Ct. 314, 318-319 (1977), and cases cited. We have already noted that there was no evidence that King was in fact attentive to the identities of the several assailants. The account of the parking lot melee does not portray circumstances likely to have fixed the identities of the assailants in King's mind. Contrast, e.g., *Commonwealth* v. *Frank*, 357 Mass. 250, 251-252, 254 (1970); *Commonwealth* v. *Kennedy*, 3 Mass. App. Ct. 218, 221 nn. 3 & 4 (1975); *Commonwealth* v. *Schlieff*, 5 Mass App. Ct. 665, 666-667, 671 (1977). If King did in fact describe one of the assailants after the assaults, the description was so vague as to be virtually meaningless. Compare *Commonwealth* v. *Moon*, 8 Mass. App. Ct. at 383 n.5. Contrast *Neil* v. *Biggers*, 409 U.S. at 194, 200; *Manson* v. *Brathwaite*, 432 U.S. at 101, 115; *Commonwealth* v. *Jones, ante* 83, 86-87 (1980). The stationhouse identifications occurred only a few days after the assaults, and King displayed no uncertainty on that

occasion. But when we weigh those two factors of reliability against the likelihood that King's identification on that occasion was based primarily on Lee's contemporaneous identification of the defendant, we conclude that King's stationhouse identification was unreliable in a constitutional sense and that it should have been suppressed.

4. *The in-court identifications.* As there was nothing impermissibly suggestive about any of Lee's pretrial identifications of the defendant, the motion to suppress was properly denied so far as it was directed to Lee's anticipated in-court identification of the defendant. See and compare *Commonwealth* v. *Dickerson,* 372 Mass. 783, 791 (1977); *Commonwealth* v. *Clifford,* 374 Mass. 293, 304 (1978). Any weakness in that identification which might have resulted from constitutionally permissible suggestiveness in the parking lot or stationhouse confrontations was for the jury to consider in determining the weight which should be accorded to Lee's testimony. See, e.g., *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 308 (1979), and cases cited.

Because King's stationhouse confrontation had been conducted in circumstances which were impermissibly suggestive, and because the resulting identification was unreliable under the *Biggers-Manson* test, the motion to suppress King's anticipated in-court identification of the defendant should have been allowed unless the Commonwealth was able to show by clear and convincing evidence that such an identification would be based on a source independent of that confrontation. See *Commonwealth* v. *Botelho,* 369 Mass. at 865-868; *Commonwealth* v. *Venios,* 378 Mass. at 26-27. As there was no such evidence, King's anticipated in-court identification of the defendant should have been suppressed.

The judgment is reversed, and the verdict is set aside.

*So ordered.*