Burnes, J.
INTRODUCTION
The defendants Eugenio Caraballo (“Caraballo”) and Victor Samboy (“Samboy”) move to suppress the controlled substances, pagers, money, cellular phone, two small satchels and one motor vehicle seized by the Boston Police Department on April 22 and 23, 1998. The defendants say that there was no probable cause to arrest them and no probable cause to seize the automobile in which the drugs, money and satchels were found. In addition, the defendants challenge the warrant which was secured and executed by the Boston Police Department in the early morning hours of April 23, 1998. For the following reasons, the court denies this motion.
FINDINGS OF FACT
Boston Police Officers William J. Gross, Thomas Menino and Detective A1 Pinto testified at the hearing on the motion to suppress. The Court finds the following facts based on that testimony and the inference which may fairly be drawn from the credible testimony.
On April 22, 1998, all of the officers were assigned to the Boston Police Department’s Drug Control Unit. That evening, Officer Gross was patrolling in the area of Neponset Circle and Gallivan Boulevard. He was working with Officer Felipe Colon; both were in plainclothes. They were in the area because they had received anonymous tips that there was drug activity in the area. The area, although a generally safe area of Boston, was known as an area where drugs were distributed. The Boston Police had made drug arrests in the Walgreen’s parking lot, the tuxedo shop and the car wash. All these locations are in or near the block where the suspected drug deal took place in this case. Gross had made five to six drug arrests in that area in the 13 months he had been assigned to the Drug Control Unit. The area is at the intersection of or easily accessible from a number of major traffic arteries— Gallivan Boulevard, Neponset Street, Quincy Shore Drive and the Southeast Expressway.
Officer Menino was in a separate Boston Police Department undercover car. He, too, was in plain clothes. Officer Menino has been on the Boston Police Force in the Drug Control Unit for two and one-half years, has made hundreds of drug arrests, has observed many drug purchases and has himself made undercover drug purchases. He has been qualified as an expert on narcotics purchases in several courts of the Commonwealth.
Officer Menino was called to the Neponset Circle area by other members of his team to watch a vehicle. As he circled the block of Neponset Street, Gallivan Boulevard, Hallet Street and Minot Street, he noticed, on his second circle, a black pick-up truck (not the vehicle he had been called to watch) parked at the corner of Hallet and Minot Streets. He turned right onto Minot Street and parked on the opposite side of the street to watch the pick-up truck. His attention had been drawn to the truck because the occupants seemed interested in him as he drove past them. Within a few minutes, a blue Pontiac Bonneville came up Hallet Street passed the pick up truck, turned right onto Minot Street from Hallet Street and parked on Minot Street at the corner of Hallet Street. The pick-up truck immediately left its corner on Hallet Street, turned right onto Minot Street and parked directly in front of the Pontiac. The passenger in the Pontiac got out and ran up to the passenger’s side of the pickup truck. Menino could see hands moving back and forth. He could see the hands of the passenger from the Pontiac go into the window of the pickup truck. Menino could see the occupants of both vehicles and observed their actions. He could not see anything below their chests because the pick-up truck obstructed his view. He did not see any items that *335 exchanged hands. The passenger from the Pontiac then ran back to the car and the car pulled away immediately. The entire event took about 30 seconds. The natural light was still good, since it was 7:30 in the evening toward the end of April. Both vehicles continued down Minot Street to Neponset Street. The pick-up truck turned right onto Neponset Street and the Pontiac turned left onto Neponset Street.
Menino radioed other members of the Unit. He said he had seen something that looked like a drug transaction. He said he would follow the blue car and others should follow the pick-up truck. Officers Gross and Colon were told to follow the pick-up truck. They were told there were two white males in it. However, instead of following the pick-up truck, Officer Colon, who was driving the vehicle in which Officer Gross was a passenger, drove out in front of the pick-up truck in the same direction as it proceeded down Neponset Street. The Officers stopped in front of the pick-up truck. The pick-up truck stopped. The passenger ran back towards the comer of Minot Street. A scuffle took place during which the passenger hit Officer Colon and tried to knee Officer Gross in the groin. The passenger, known to Officer Gross as a Mr. Dunn, threw a white packet in the sewer drain. The officers could see it but could not immediately reach it since it was approximately five or six feet below ground level. The package was sitting on some dry leaves and dirt.
The officers pried the grated sewer cap off with a crow bar. Officer Gross held onto another officer by the legs so he could retrieve the packet. The white packet, once retrieved, turned out to be ten glassine bags held together by a black mbber band. The bags contained a white powder which appeared to be heroin. The time between stopping the truck and retrieving the package from the sewer took about five minutes.
These officers arrested the passenger and driver of the pick-up truck. They radioed Officer Menino to tell him they had recovered what appeared to be drugs.
Menino, in the meantime, had been following the blue Pontiac Bonneville. By the time he received the radio transmission informing him that what appeared to be dmgs had been retrieved from the sewer, having been thrown there by the passenger of the pick-up, he was on Bowdoin Street in Dorchester. He then activated his lights and stopped the Pontiac. He was intending to arrest the occupants of the Pontiac at that time.
Other officers, SargentThomas and Detective Pinto, joined him.[1] The two defendants, Caraballo and Samboy, were placed in handcuffs and taken to the side of the road. The officers did a quick search of the car and found nothing. They did not find any drugs in Caraballo’s or Samboy’s possession. The officers recovered $62 from Caraballo, however, Samboy had no money in his possession.
While Menino was following the Pontiac, the driver appeared to obey .the driving laws. The car was not speeding, not running any traffic lights and stopped promptly when Menino put on his blue lights and siren. Menino had never seen Samboy or Caraballo nor had he seen the blue Pontiac before. He learned later that the car did not belong to either of them.
The Pontiac was not towed from the scene but driven to the police station by a police officer. This is the standard operating procedure used when the police intend to search a vehicle once it is brought to the station.
Back at the police station, Officer Gross was the booking officer for both defendants. The personal property recorded inclúded a pager, a Nextel phone and $62 from Caraballo.
Detective Pinto searched the vehicle. He found nothing unusual. Officer Menino then went and searched the vehicle. He saw some duct tape behind the grill in the dashboard. He took a flashlight and looked behind the grill, seeing some air fresheners. He then suggested that they call a drug dog. They put out the radio request to the Boston Police K-9 Unit for a specially trained drug-sniffing dog. The dog, Kelsey, with his handler, came to the station. Kelsey searched .the car and became very excited near the dashboard area, clawing or chewing the area.
Thereafter, Detective Pinto made out an affidavit in support of a search warrant. Detective Pinto requested permission to search storage areas, compartments locked and unlocked in the vehicle, and any other concealed places, including any potential “hide." A “hide,” in this context, is a special compartment or location in a vehicle designed to keep property in the vehicle so itwill not be easily detected. The application was allowed by the clerk magistrate for Dorchester District Court. The return indicates that the search was made at 1:40 a.m. on April 23, 1998.
The search revealed, behind the dashboard, 296 glassine bags containing an off-white substance believed to be heroin, a larger bag containing an off-white substance in excess of 14 grams believed to be heroin, $1302 in United States currency, one small blue satchel and one small black nylon satchel.
CONCLUSIONS OF LAW
Where, as here, an arrest of a person and seizure of a motor vehicle are made without a warrant, the Commonwealth must establish that the police had probable cause for both the arrest and the seizure of thevehicle. Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992) (search of person): Commonwealth v. Motta, 424 Mass. 117, 120-22 (1997) (search of person and vehicle). Probable cause to arrest a person exists “where, at the moment of the arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was commit *336 ting an offense.” Santaliz, 413 Mass. at 241, quoting Commonwealth v. Storey, 378 Mass. 312, 321 (1979) cert. den. 446 U.S. 955 (1980). In this case, the “prudent person” involved is an officer experienced in narcotics investigation. See Santaliz, 413 Mass. at 242 and cases cited.
Probable cause to seize the vehicle exists if the Commonwealth establishes that the police “had enough knowledge ‘to warrant a person of reasonable caution in believing’ ” that the vehicle contained drugs. Motta, 424 Mass. at 120, citing Commonwealth v. Cast, 407 Mass. 891, 895 (1990), quoting Commonwealth v. Gullick, 386 Mass. 278, 283 (1982). The officers, and the court in evaluating their actions, must consider what the facts probably indicate, not whether there is a prima facie case and certainly not whether there is proof beyond a reasonable doubt. Cast, 407 Mass, at 896, quoting Commonwealth v. Alessio, 377 Mass. 76, 82 (1979). Furthermore, the facts must be looked at as a whole, not each one isolated from the other. See Santaliz, 413 Mass. at 242. No one factor will control as to whether there is probable cause. Commonwealth v. Kennedy, 426 Mass. 703, 708 (1998).
Here, officers of the Boston Police Department Drug Control Unit were patrolling the area of Gallivan Boulevard and Neponset Street because they had received anonymous tips of drug deals in the area. They knew it to be an area where drugs were bought and sold. Several of the officers had made drug arrests in the area, although not specifically on the corner of Hallet and Minot Streets. (This comer is the opposite corner of the block from where Gallivan Boulevard and Neponset Street intersect, the block being constituted of Gallivan Boulevard, Hallet Street, Minot Street and Neponset Street.)
Officer Menino, an experienced narcotics officer, saw what appeared to him to be a drug transaction. He did not see any objects or money change hands. It is not necessary that he see that but it is one factor to consider in making the determination of probable cause. Id.
What he did see was a black pick-up truck with two occupants waiting on the corner of Hallet Street. He then saw the blue Pontiac drive past the pick-up truck, turn right on Minot Street and park just around the comer. As soon as the Pontiac parked, the pick-up truck drove around the corner and parked just in front of the Pontiac. As soon as the truck parked, the passenger from the Pontiac got out of the car and ran up to the passenger side of the truck. Menino then saw hand movements from both the Pontiac’s passenger and the pick-up truck’s passenger. He saw the hand(s) of the Pontiac’s passenger go in through the window of the pick-up truck.
This event took place quickly and the Pontiac’s passenger immediately ran back to the Pontiac. Both vehicles left immediately and parted at Neponset Street. It is fair to infer from these events that the meeting was pre-planned and that the person from the Pontiac was transferring something to the person in the pick up truck.
While none of the officers knew the defendants or their vehicle before, see, e.g., Motta, 424 Mass, at 119 (the officers knew Morales, the co-defendant, as a drug dealer; they did not know the particular car which he was driving when he was stopped), Officer Menino did not stop the defendants until he received radio notification from the officers that stopped the truck that the occupants of the truck had dmgs and had tried to dispose of them. At that time, a pmdent person in Officer Menino’s position would certainly have been justified in believing that the defendants had committed a crime. He had probable cause to arrest them.
After he stopped the defendants and arrested them, he searched them. He found no dmgs and only $62 on defendant Caraballo. As an experienced dmg officer, he had reason to believe that the defendants were the sellers and that he would find money and dmgs in their possession. When he did not find these in his search of the people, it was reasonable for him to believe there was money or dmgs or both in the vehicle.[2]
Officer Menino searched the Pontiac briefly. He found no dmgs, money or dmg paraphernalia.
One of the officers, it is not clear which one, drove the Pontiac to the police station. The decision to drive the vehicle to the station, rather than have it towed by a towing company to its premises, was made because the officers had decided to search the vehicle.
The defense, by its questions, implied that the decision to drive the vehicle to the station and search it was made at the time of the arrest of the defendants. There is no evidence to support this premise.
At the station, the officers more thoroughly searched the Pontiac, discovered duct tape and air fresheners behind a grill in the dash board, secured the assistance of a drug-sniffing dog from the Boston police K-9 Unit, took the grill off and found 296 glassine bags containing an off-white substance believed to be heroin, one larger bag containing an off-white substance in excess of 14 grams believed to be heroin, $1302 in United States currency, one small blue satchel and one small black nylon satchel. Although the officers obtained a search warrant before removing the grill, they did not need one, since they had probable cause to search the car. Motta, 424 Mass, at 124-25. Therefore, none of the defendants’ arguments founded on the alleged inadequacy of the affidavit submitted in support of the search warrant are relevant. It is also irrelevant that the officers moved the automobile to the station to search it. Id. at 124.
CONCLUSION
For the reasons stated in this opinion, the defendants’ motion to suppress is denied.

There was some conflict in the testimony as to whether Detective Pinto was present at the stop. For purposes of this motion, that is not an important fact.

he Court finds that these are fair inferences to drawfrom the evidence, although Officer Menino did not explicitly so testify as to this thinking. As Justice Marshall said in Kennedy, "[w]e prefer more extended testimony on an officer’s ‘inferential process,’ and here the Commonwealth should have elicited from the officer more detail” concerning the what and why of his thought process. See Kennedy, 426 Mass, at 706.