## COMMONWEALTH *vs.* LOUIS SANTOS.

Suffolk. March 8, 1988. — July 11, 1988.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Identification. Waiver. Constitutional Law,* Waiver of constitutional rights. *Evidence,* Spontaneous utterance. *Witness,* Competency. *Practice, Criminal,* Instructions to jury.

In a criminal case, a one-on-one stationhouse identification of the defendant was, in the totality of the circumstances, unconstitutionally suggestive, in light of the suggestibility and limitations of the moderately retarded identifying witness. [780-782]

The record of an identification suppression hearing at a criminal trial did not support the judge's conclusion that the defendant knowingly and willingly waived his constitutional rights by assenting to a one-on-one confrontation with a witness at the police station. [782-783]

A "showup" identification of a criminal defendant, shortly after the crime and immediately after his arrest, by two witnesses, who had viewed the assailants and given a detailed description of them to the police, was properly admissible in evidence. [783-784]

Testimony corroborating an unconstitutionally suggestive one-on-one stationhouse identification of a criminal defendant is not admissible evidence. [784-785]

Sufficient direct and circumstantial evidence was produced by the Commonwealth at a murder trial, independent of certain improperly admitted identifications of the defendant, to withstand the defendant's motion for a required finding of not guilty. [785-787]

In the circumstances of a murder trial where the main identifying witness, who had described his assailants as three black men, identified two white men during a voir dire, the judge erred in denying the defendant's motion for a competency examination of the witness pursuant to G. L. c. 123, § 19. [787-788]

The court cautioned against excessive use of comparisons with other cases in instructing jurors [788], and stated that the proper statement of the standard of proof beyond a reasonable doubt is contained in *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), and that the language in *Commonwealth* v. *Little,* 384 Mass. 262, 266 n.4 (1981), should not be used in instructing jurors [788].

INDICTMENTS found and returned in the Superior Court Department on January 11, 1984.

Pretrial motions to suppress evidence were heard by *John P. Forte*, J., and the cases were tried before *Sandra L. Hamlin*, J.

*Walter T. Healy* (*Frank G. Kelleher & James E. McCall* with him) for the defendant.

*Judy G. Zeprun*, Assistant Attorney General (*Ronald Moynahan & Margaret Steen Melville*, Assistant District Attorneys, with her) for the Commonwealth.

ABRAMS, J. The defendant, Louis Santos, appeals from his convictions of murder in the first degree on a theory of felony-murder, armed robbery, assault and battery by means of a dangerous weapon, and armed assault with intent to rob. For the reasons stated in this opinion, we reverse and remand for a new trial.

We summarize the facts. At about 5 P.M., on October 28, 1983, Colleen Maxwell, a social worker, was accompanying Charles Bartick, a thirty-two year old man born with Down's syndrome, to the Ashmont subway station in the Dorchester section of Boston. Bartick was a resident of Van Winkle House, a supervised community residence for retarded adults on Van Winkle Street in Dorchester. As Bartick and Maxwell walked along a walkway leading from Van Winkle Street to the subway station, they were confronted by three young black males. One man said, "Give me your fuckin' money," to Bartick and Maxwell. One of the other men pointed a gun at Bartick. Bartick pushed the gun away with his arm, then the third man, who wore a gold ring, hit Bartick on the head with the ring. The three men took Maxwell's money and left. Maxwell ran after them.

Shortly after 5 P.M., Nicola Garofalo, a mental health assistant for the Department of Mental Health, was outside Van Winkle House when he heard screaming and saw Maxwell approaching the house. Maxwell was searching in her purse for her keys and was very upset. She told Garofalo that she had been robbed and that Bartick was hurt. She asked Garofalo to pick Bartick up at the subway station. Maxwell got in her automobile and drove away from the house. Garofalo found Bartick at the subway station. Bartick was bleeding from his

head. Garofalo took Bartick to Van Winkle House where a counselor tended to his wound and then took Bartick to a hospital where he received stitches to his head. Garofalo went looking for Maxwell.

Meanwhile, at about 5:30 P.M., William Whall, a resident of nearby Dorchester Avenue, was driving home. At the intersection of Van Winkle Street and Dorchester Avenue, he noticed a lone black male, approximately seventeen years old, standing on the corner of Van Winkle Street hailing a taxicab. The young man was joined by three other young black males, two of whom were fourteen or fifteen years of age and one of whom was about seventeen years of age. Whall saw a woman, later identified as Colleen Maxwell, drive out from Van Winkle Street sounding her horn and pursuing the group of youths down Dorchester Avenue. The woman cut the group off at Mercier Avenue. Whall heard a couple of "pops" which he believed were gunshots. Whall saw the young men running down Dorchester Avenue. He lost sight of them in the area of Sullivan's Confectionery. Whall saw an automobile stopped in the middle of Mercier Avenue with the driver's door open. Colleen Maxwell was sitting on the sidewalk bleeding profusely from her nose and mouth. An ambulance came for Maxwell, who later died of a bullet wound.

At approximately 5:30 P.M., William Marinelli and Kevin Hagberg, two high school students, were in the vicinity of Dorchester and Mercier Avenues when they heard gunshots. About ten seconds later, they saw three black males run down Mercier Avenue onto Dorcester Avenue in the area of Sullivan's Confectionery. One of the young men was wearing a blue windbreaker, another was wearing an orange or red parka and the third was wearing a grey sweatshirt. Hagberg noticed the butt of a gun sticking out of the pocket of the orange or red parka.

Hagberg and Marinelli turned onto Mercier Avenue where they saw Maxwell lying on the ground. When the police arrived, Hagberg and Marinelli told them they had seen three young men fleeing the area. They got into the police car with Officers Egan and Wilson and proceeded to search the area.

Hagberg estimated that the three young men were aged fourteen to seventeen, and that the man in the blue jacket was approximately seventeen. While in the police cruiser, Hagberg and Marinelli heard a radio broadcast concerning a foot pursuit. At some point, the police showed Hagberg and Marinelli a suspect. The suspect was not one of the three men Hagberg and Marinelli had observed running near the scene of the shooting.

Meanwhile, Officers Robert Flynn and William Baker were cruising the Codman Square area of Dorchester looking for the suspects. They observed five to eight black males, aged fifteen to twenty, at the entrance to the basketball court in Evans Park. They turned the cruiser around and drove back by the playground. At that time, three of the young men started running. The defendant was wearing a blue jacket, another man was wearing a grey jacket, and the third man was wearing a red parka. Officer Baker pursued the defendant and the man in the grey jacket on foot. The two suspects separated on Stanton Street, at which point they ran onto the street in front of a parked police cruiser. Officer Paul Donahue, who had heard reports of the chase on the police radio, jumped out of the cruiser and chased the defendant. Officer Baker continued to chase the man in the grey jacket. Officer Donahue apprehended the defendant on the porch of a house on Dyer Street.

Officers Egan and Wilson went to the house on Dyer Street. Hagberg and Marinelli were still in the back of the police cruiser. As the defendant emerged from the house, Officer Wilson heard someone in the back seat say, "That's him. That's definitely him." Officer Wilson turned to Hagberg and Marinelli and asked them if they were sure that the defendant was one of the men they had seen earlier. They answered affirmatively. Later that night, at the police station, Marinelli and Hagberg also identified the defendant as one of the men they had seen running in the vicinity of Colleen Maxwell's shooting.[1] The defendant was the only black male in the office.

[1] About one and one-half weeks later, Hagberg again identified the defendant from an array of twelve to fourteen photographs. In December, 1983, Marinelli identified the defendant from among spectators at the probable

At the police station, the defendant denied shooting Maxwell and he stated that he did not believe that two people had already identified him. He told the police that he had left his house at approximately 4:15 P.M. that day and had played basketball with nine other people for thirty to forty-five minutes. The defendant could only name two other people with whom he had played. The defendant stated that he had run from the police because he possessed some marihuana, and that the other man who ran away was selling it. The defendant possessed no marihuana when booked; he told the police that he discarded it during the chase. Later that evening, the defendant accompanied a police officer to the spot where he said he had dropped the marihuana, but none was found.

The next day, Michelle Bernard, a nine year old girl, found a wallet containing papers belonging to Colleen Maxwell in an uncovered garbage can outside her home along a route from the site of Colleen Maxwell's murder and the park where the police initially saw the defendant.

Prior to trial, the defendant moved to suppress the one-on-one identifications of the defendant. The motion judge declined to suppress the initial identifications Hagberg and Marinelli made outside the house on Dyer Street; however, the judge suppressed the one-on-one stationhouse identifications on the ground that they were not justified by exigent circumstances. The defendant filed a motion seeking to suppress Bartick's stationhouse identification of the defendant.[2] The trial judge denied that motion.

---

cause hearing. Hagberg was unable to identify the defendant. Both Hagberg and Marinelli identified the defendant at trial.

[2] Suppression of Bartick's stationhouse identification was argued as part of the motion to suppress. The defendant, in his motion, sought to suppress "[a]ny and all identifications made while the defendant was in custody in Area C . . . ."

At trial, defense counsel argued that the judge's ruling applied to Bartick's stationhouse identification as well and that the motion judge inadvertently neglected to mention Bartick's identification. The motion judge stated, in his findings, that he intentionally had not ruled on Bartick's identification because he did not consider the robbery investigation to be part of the murder charge. The defendant's arguments that the motion judge necessarily included Bartick's stationhouse identification are not supported by the record.

1. *The identifications.*

a. *Bartick's stationhouse identification.* The judge found that Bartick was a thirty-two year old man suffering from Down's syndrome. Bartick could be described as moderately retarded with an I.Q. somewhere between thirty-five and forty-nine. Bartick was unable to conceptualize abstractions, could not describe the passage of time (although he knew how to tell time), could not read, and could write only his name.

Four hours after the robbery, Bartick identified Louis Santos as one of Colleen Maxwell's assailants at a one-on-one confrontation at the Area C police station. Bartick had earlier described the assailants as three black males, one of whom had a handgun. During his voir dire testimony, elicited in response to defense counsel's motion to suppress Bartick's stationhouse identification, Bartick stated that the assailants had "brown" faces, yet he identified two white males, a police detective and a member of the defense staff, as two of Maxwell's assailants.[3]

We consider whether the judge committed an error of law in admitting the identification because the identification procedure was unconstitutionally suggestive and thus violative of the defendant's due process rights. "We are mindful that the responsibility of weighing credibility and finding fact is reposed in the trial court. In reviewing the testimony adduced at voir dire, we do not attempt to usurp that authority nor do we seek to exceed the limitations traditionally placed on us as an appellate court. Nevertheless, where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review. Our appellate function requires that we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.,* 398 Mass. 806 (1986), quoting *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977). See *Commonwealth* v. *Murphy*, 362 Mass. 542, 551 (1972) (Hennessey, J., concurring). We think that

---

[3] Defense counsel moved to have Bartick examined for competency, see G. L. c. 123, § 19 (1986 ed.), after his voir dire testimony. The judge denied the defendant's motion. See *infra* at 787-788.

Bartick's one-on-one identification of the defendant was not constitutionally permissible.

With regard to one-on-one confrontations, we have said that, while disfavored, such identifications are not subject to a per se rule of exclusion. *Commonwealth* v. *Storey*, 378 Mass. 312, 317 (1979), cert. denied, 446 U.S. 955 (1980). See *Commonwealth* v. *Torres*, 367 Mass. 737, 740 (1975). "Although such confrontations pose particularly serious dangers of suggestiveness, we would consider it ill advised to exclude as constitutionally unacceptable all evidence that has been derived from single person confrontations simply because these identification procedures might have taken place just as easily in the form of lineups." *Storey, supra.* See *Commonwealth* v. *Barnett*, 371 Mass. 87, 91-92 (1976), cert. denied, 429 U.S. 1049 (1977). Our test is simply whether, in light of the "totality of the circumstances," the identification procedure was unnecessarily suggestive of the defendant. *Commonwealth* v. *Bumpus*, 354 Mass. 494, 499-500 (1968), cert. denied, 393 U.S. 1034 (1969). *Storey, supra.* The burden is on the defendant to prove, by a preponderance of the evidence, that the identification was "'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979), quoting *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967).

The defendant claims that the stationhouse identification by Bartick was unconstitutionally suggestive in light of Bartick's limitations. Bartick was unable to express how long he was able to view the defendant at the scene of the crime. Furthermore, Bartick only identified the perpetrators as three young black men, one of whom had a gun. There was, therefore, no indication from Bartick's description that he saw the defendant for a sufficient length of time to enable him to make a subsequent identification of the defendant.[4] See *Commonwealth*

---

[4] On the day of the robbery, Bartick only described the perpetrators in terms of their race. On voir dire, Bartick stated that one man had on a red shirt, that another man had on a black coat, and that the third man had on a pink shirt. He also stated that the man with the ring had on a white shirt. He was not asked at trial for a description.

v. *Moon,* 380 Mass. 751, 757 (1980) (identification procedure tainted where victim's description of assailant was so general that he would not have been able to identify assailant, but police officer suggested defendant as assailant). Additionally, although the trial judge found that, "Bartick has no difficulty recognizing people and can remember how or when he knew them but may not remember their names," this finding is not supported by the evidence. Bartick identified two white males as the robbers.[5] The police officers did not suggest to Bartick that Santos was involved in the robbery. Nevertheless, at the stationhouse Santos was the only nonuniformed black person in the office at the time of Bartick's identification.

The evidence also contradicts the judge's finding that Bartick is not a suggestible individual. Sharon Bacon, Bartick's social worker, stated that when Bartick does not know the answer to a question, "rather than telling you that he doesn't know he will skirt the issue or give you an answer that he thinks you want because he doesn't want to admit that he doesn't know something."[6] In these circumstances, we conclude that the stationhouse identification by Bartick was unduly suggestive and therefore must be suppressed.

We address the Commonwealth's contention that Santos waived his constitutional rights by assenting to the one-on-one confrontation. In her findings on the motion, the judge found that "Santos knew he was being viewed by Bartick and not only agreed but wanted Bartick to see him. If Santos had not voluntarily agreed to be viewed by Bartick, [Officer] Murphy would not have conducted the viewing."

We " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . 'do not presume acquiescence in the loss of fundamental rights.' " *Commonwealth* v. *Harris,* 371 Mass. 462, 472 (1976), quoting *Johnson*

---

[5] At trial, the defendant moved to be seated among the spectators during Bartick's testimony. The judge denied that motion. During his testimony, Bartick identified a black spectator twice as two of the three culprits and the defendant's brother as the third participant.

[6] On three separate occasions during voir dire, Bartick sought approval of his answers by asking whether he was doing well.

v. *Zerbst*, 304 U.S. 458, 464 (1938). "Where constitutional rights have been involved in criminal cases, certain alleged waivers have been tested by careful scrutiny as to whether the defendant acted freely and knowingly." *Spence* v. *Reeder*, 382 Mass. 398, 411 (1981). The judge made no findings as to whether Santos' assent to the identification was knowingly made. There was no evidence as to the manner in which Santos agreed to be viewed. The record does not indicate whether Santos agreed to forgo a lineup or whether he agreed to the suggestive procedure. Furthermore, the record does not indicate whether Santos was apprised of Bartick's limitations. We conclude that the identification procedure was impermissibly suggestive. Evidence of the identification must be excluded at Santos' new trial.[7] *Bumpus, supra* at 499-500.

b. *Hagberg's and Marinelli's identifications.* The defendant appeals from the motion judge's failure to suppress Hagberg's and Marinelli's identification, at the time Santos was apprehended, outside the house on Dyer Street. The motion judge correctly concluded that the identification was constitutionally permissible and admissible as evidence.[8]

Hagberg and Marinelli were able to view the defendant and his two companions for approximately fifteen seconds as they ran down Mercier Avenue to Dorchester Avenue. The three suspects ran directly past Hagberg and Marinelli, and one suspect brushed Marinelli. Hagberg and Marinelli were able to provide the police with specific descriptions of the assailants, including their approximate ages and the details of their clothing. Furthermore, the identification was made immediately following the defendant's apprehension, and after both witnesses had been shown another suspect who they both determined was not involved in Maxwell's murder.

---

[7] We have decided this issue without regard to the statement of Officer Paul Murphy that Santos was in Bartick's view "[o]nly when we brought Mr. Bartick to the hallway where we pointed out Mr. Santos."

[8] The motion judge suppressed Hagberg's and Marinelli's stationhouse identifications in essence because the two witnesses already had identified Santos and there was ample time to arrange for a lineup. Thus, there was no need for a second field identification. There is no error in this ruling.

There is no error in the identification procedure. Hagberg and Marinelli identified the defendant as he was being led from the house on Dyer Street before the police had asked them whether Santos was one of the men they had seen fleeing the scene of the murder. "Such meetings between witnesses or victims and suspects in custody are often unavoidable or nearly so; and in any event the police procedure of arranging these showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime. . . . To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification. . . . A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track." (Citations omitted.) *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976). Accordingly, we conclude that the motion judge correctly denied the defendant's motion to suppress.[9]

2. *Witnesses to Bartick's identification.* The judge admitted testimony corroborating Bartick's stationhouse identification presented by Nicola Garofalo and Officers Murphy and Walsh. That was error. Because Bartick's identification violated the defendant's due process rights, testimony corroborating the unconstitutional identification must be excluded as well.

We reject the Commonwealth's argument made to the trial judge and on appeal that the testimony of Garofalo, Murphy, and Walsh is admissible as evidence of a spontaneous utterance. Although hearsay, spontaneous utterances are admissible when

---

[9] The defendant argues that reports of the foot pursuit transmitted over the police radio in the cruiser in which Hagberg and Marinelli were passengers rendered the identification unduly suggestive. We do not agree. Hagberg stated during the hearing on the motion to suppress that he was not paying attention to the broadcasts. Marinelli remembered some of the broadcasts, but stated that his identification of Santos was based on his observations as Santos fled the scene of Maxwell's murder.

"made during a rapidly developing incident in circumstances reasonably negating premeditation." *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983). See *Commonwealth* v. *Rivera*, 397 Mass. 244, 248 (1986). Spontaneous utterances are admissible as evidence "tending to prove the circumstances under which the crime charged was committed." *Commonwealth* v. *Harris*, 376 Mass. 201, 207 (1978), quoting *Commonwealth* v. *Simpson*, 300 Mass. 45, 50, cert. denied, 304 U.S. 565 (1938). *Commonwealth* v. *Murphy*, 362 Mass. 542, 551 (1972) (admissible statements made while events of crime were transpiring). See P.J. Liacos, Massachusetts Evidence 351 (1981 ed. & Supp. 1985); *Commonwealth* v. *Sellon*, 380 Mass. 220, 229 (1980); *Commonwealth* v. *Reid*, 384 Mass. 247, 258-259 (1981). Bartick's statement was not a spontaneous utterance as to the robbery, but rather a response to the suggestive identification procedure.

3. *Motion for a required finding of not guilty.* The defendant contends that the trial judge erroneously denied his motion for a required finding of not guilty, and that without evidence of the extra-judicial identifications, the Commonwealth lacks sufficient evidence of guilt to withstand the defendant's motion. In considering the defendant's contention, we assume that Bartick will not be able to identify Santos at trial.[10]

The test for determining the propriety of a judge's denial of a motion for a required finding of not guilty is "whether the Commonwealth produced enough evidence, taken in the light most favorable to the Commonwealth, to satisfy any rational trier of fact beyond a reasonable doubt that each element of the crime was present." *Commonwealth* v. *Hilton*, 398 Mass. 63, 64 (1986). *Commonwealth* v. *Barry*, 397 Mass. 718, 719 (1986). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). Our review of the evidence convinces us that the Commonwealth has met that burden.

---

[10] Because the stationhouse identification is not admissible, unless the Commonwealth can demonstrate a basis for an in-court identification independent from the tainted procedure, any in-court identification by Bartick would not be admissible at retrial.

Bartick was able to describe the robbery, the fact that one assailant had a gun, and that one assailant, wearing a ring, hit him on the head. Bartick's testimony as to the robbery was corroborated by Garofalo, who stated that Maxwell had run from the direction of the subway station screaming, that she told him that she had been robbed. The fact of an injury to Bartick's head is not disputed.

Garofalo stated that Maxwell drove off in her car. William Whall testified to seeing a woman he later identified as Maxwell drive out of Van Winkle Street and chase the three young men from the corner of Van Winkle Street, across Dorchester Avenue, and up Mercier Avenue. Whall stated that he saw Maxwell "corral" the three young men with her car, and then heard what he believed to be pistol shots. Whall watched the young men run up Dorchester Avenue. He lost sight of them at Sullivan's Confectionery on Dorchester Avenue.

At Sullivan's Confectionery, Hagberg and Marinelli saw the three young black men running up the street, just seconds after the witnesses heard gunshots. Hagberg saw that one of the men had a gun, partly concealed. Hagberg and Marinelli had described the three men as wearing a red or an orange parka, a grey sweatshirt, and a blue windbreaker and dungarees. Minutes later, both men identified Santos as one of the three men they had seen fleeing the area of Maxwell's murder. The defendant was dressed in a blue windbreaker and dungarees. Marinelli identified the defendant at the probable cause hearing; both men identified him at trial. Evidence of Hagberg's photographic identification of Santos also was admitted without objection at trial. From this evidence of the chain of events surrounding Maxwell's shooting, the jury could have inferred that Hagberg and Marinelli had seen the same three young men whom Whall saw being chased by Maxwell.

There was evidence that the victim's empty wallet was discovered in a trash can located one street away from the street on which the three men had fled the scene of the murder. Furthermore, the end of the street on which the wallet was found was in the vicinity of the park in which the police first encountered the defendant. The defendant's flight from the

park was an indication of a consciousness of guilt. The defendant provided evidence of a motive for the robbery with his testimony that he supported a marihuana habit that cost him $35 a week, although he was unemployed in October, 1983. Finally, circumstantial evidence supported a reasonable inference that the three men were engaged in a joint venture. "The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). See *Commonwealth* v. *Longo*, *ante* 482, 486 (1988); *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). Existence of a joint venture may be proved by circumstantial evidence. *Longo*, *supra* at 487. *Casale*, *supra*. There is evidence that the three young men fled together and that the defendant was among them. We conclude that the Commonwealth's evidence is sufficient to withstand the defendant's motion for a required finding of not guilty.

4. *Other issues.*

a. *Competency.* After Bartick identified two white men at the voir dire, the defendant moved for a competency examination pursuant to G. L. c. 123, § 19 (1986 ed.).[11] In these circumstances, the judge should have ordered a competency evaluation pursuant to G. L. c. 123, § 19. "If the competency of a witness is placed in issue, 'it is the duty of the judge to examine into the question of [the witness's] competency, and to reject [the witness] unless [the judge] is satisfied that [the witness] is competent.'" *Commonwealth* v. *Gibbons*, 378 Mass. 766, 770 (1979), quoting *Commonwealth* v. *Reagan*, 175 Mass. 335, 340 (1900). Testimony from an expert on Down's syndrome is not the equivalent of following the man-

---

[11] General Laws c. 123, § 19, provides: "In order to determine the mental condition of any party or witness before any court of the commonwealth, the presiding judge may, in his discretion, request the department [of Mental Health] to assign a qualified physician or psychologist, who, if assigned, shall make such examinations as the judge may deem necessary."

date of the statute that an impartial expert be assigned by the Department of Mental Health.[12]

b. *Instructions to the jury.* The defendant complains of instructions explaining felony-murder by analogy to other cases. "It is proper to quote or to paraphrase to the jury statements made by this court in decided cases, provided of course that care is taken to see that the statements are properly applied to the case in hand and do not leave any false impression as to the duty of the jury." *Commonwealth* v. *Heffner*, 304 Mass. 521, 525 (1939). In *Commonwealth* v. *Costa*, 360 Mass. 177, 187 (1971), we stated that the judge did not err in refusing "to import into [the] case the conclusions of fact recited in [another] opinion as based upon evidence there previously presented in the trial court and the findings of the trial court in that case." Too much detail by analogy to other cases diverts the jury's attention from the issue whether the Commonwealth has proved guilt beyond a reasonable doubt to a comparison between the evidence before them and the facts of the other cases mentioned by the judge. A judge should not elaborate on the facts of other cases in instructing the jurors. Such a practice can only cause confusion and lead to error.

The instruction on reasonable doubt upheld in *Commonwealth* v. *Little*, 384 Mass. 262, 266 n.4 (1981), misstates the proper instruction for reasonable doubt and should not be used in instructing juries. The proper statement of the standard of proof beyond a reasonable doubt is contained in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

The judgments of the Superior Court are reversed, the verdicts set aside, and the case remanded for a new trial.

*So ordered.*

---

[12] Although a judge may permit an expert to testify at trial as to objective manifestations of Down's syndrome and the limitations of persons so afflicted, care must be taken that such testimony is not used "for the purpose of assessing a witness's credibility." *Commonwealth* v. *Widrick*, 392 Mass. 884, 888 (1984).