COMMONWEALTH *vs.* JAMES J. SMITH.

Berkshire. October 8, 2010. - April 26, 2011.

Present: IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Armed Home Invasion. Firearms. Grand Jury. Practice, Criminal,* Indictment, Instructions to jury, Assistance of counsel, New trial, Capital case. *Constitutional Law,* Grand jury, Indictment, Assistance of counsel, Fair trial. *Felony-Murder Rule. Evidence,* Threat, Motive, Relevancy and materiality, Exculpatory. *Homicide.*

A Superior Court judge erred in denying a criminal defendant's motion for a required finding of not guilty on an indictment charging armed home invasion, where there was a substantial risk that the defendant was convicted of a crime for which he was not indicted by the grand jury, given that the grand jury were presented with evidence sufficient to charge the defendant with armed home invasion of two apartments but returned only one indictment that did not specify the apartment or the victim, and given that the trial jury were then presented with similar testimony that could have supported convictions of armed home invasion as to both incidents. [543-545]

At a criminal trial, no prejudicial error arose from the admission in evidence of threats made against a witness, where the Commonwealth offered the evidence to show gang involvement and rivalry that were part of the general milieu in which the defendant was operating and that might have contributed to the defendant's motives; where there was sufficient foundation demonstrating gang animosity or gang involvement in the drug businesses operating from the apartment in which the victim was murdered; and where the danger of any unfair prejudice was minimal, while the evidence of the threat had significant probative value. [545-547]

This court declined to address a criminal defendant's argument that the judge at a murder trial incorrectly instructed the jury regarding excessive force in self-defense, where the defendant was convicted of murder in the first degree on theories of both deliberate premeditation and felony-murder, and self-defense was inapplicable to the defendant's conviction on a theory of felony-murder, which this court affirmed on appeal. [548]

A criminal defendant failed to demonstrate that his trial counsel provided ineffective assistance at his murder trial by failing properly to advise him of his right to testify, where it was not manifestly unreasonable for trial counsel to have advised the defendant that waiver of the right to testify was the wiser course, considering the benefits to be gained from the problematic testimony, the risks associated with placing the defendant on the stand, and the fact that the basis for a self-defense instruction had already been established through the testimony of another witness [549-553]; further, the defendant failed to demonstrate that trial counsel failed to

establish and argue that forensic evidence rendered the Commonwealth's theory of the case impossible [553-554], or that counsel's decision not to call a certain witness to testify was manifestly unreasonable, given the risks inherent in calling the witness and the minimal value of that testimony [554-556]; finally, this court declined to address the defendant's contention that his trial counsel's failure to request a provocation instruction constituted ineffective assistance [556].

A Superior Court judge did not abuse his discretion in denying, without a hearing, a criminal defendant's motion for a new trial. [556-557]

INDICTMENTS found and returned in the Superior Court Department on August 22, 2006.

The cases were tried before *John A. Agostini*, J., and a motion for a new trial, filed on March 18, 2008, was heard by him.

*Stewart T. Graham, Jr.*, for the defendant.

*Karen Carlo*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on the theories of deliberate premeditation and felony-murder. The defendant also was convicted of armed home invasion and illegal possession of a firearm. On appeal the defendant argues that (1) the armed home invasion indictment returned by the grand jury was not sufficiently specific; (2) evidence of threats made against a witness should not have been admitted; (3) the judge incorrectly instructed the jury regarding excessive force in self-defense; (4) the judge erred in denying him an evidentiary hearing regarding his motion for a new trial; and (5) the Commonwealth failed to present sufficient evidence of premeditation. The defendant also filed a motion for a new trial on the grounds that his trial counsel was ineffective in (a) failing properly to advise him of his right to testify; (b) failing to establish and argue that forensic evidence rendered the Commonwealth's theory of the case impossible; (c) failing to call an important witness; and (d) failing to request a provocation instruction. The defendant's appeal from the denial of his motion for a new trial has been consolidated with his direct appeal. We affirm the murder conviction, and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues.

In June, 2006, the defendant moved into the apartment of Patricia Higgs in North Adams where he lived (along with Higgs, her fiancé, and her daughter) for approximately three weeks. The defendant was a member of the Crips street gang and sold both powdered and "crack" cocaine, heroin, and other drugs from Higgs's apartment, employing Higgs in the business in exchange for money and product. While operating out of Higgs's apartment the defendant enjoyed a steady stream of business but he and Higgs ultimately had a falling out and Higgs asked him to leave.

Approximately one week after Higgs asked the defendant to leave, a member of the Bloods street gang known as "G-Money" moved into Higgs's apartment along with his girl friend, Angela Stark, and began operating a similar business. Shortly after G-Money's arrival, Higgs was sitting in her kitchen when two men entered the kitchen and told Higgs to be quiet. Higgs recognized one of the men as a member of the Crips whom she also understood to be the defendant's cousin. The two men then entered G-Money's bedroom, placed guns against the heads of G-Money and Stark, and proceeded to beat G-Money. Within hours of the beating, G-Money vacated the apartment. Several days after G-Money's departure another member of the Bloods, Kijona Osmond, moved into the apartment. Osmond, the murder victim, began selling drugs from the apartment using the same business model as his predecessors.

At approximately 2 A.M. on July 25, 2006, the defendant went to a Dunkin' Donuts restaurant in North Adams a short distance from Higgs's apartment. The defendant mentioned to one of the store employees that he was new in North Adams, which he then compared to his native New York City. The defendant was "antsy" and continued the conversation by comparing the "excitement" in the Bronx with the atmosphere in North Adams. He asked the employee whether she would contact the police if she saw someone get shot. The defendant then left the Dunkin' Donuts and proceeded to Higgs's apartment.

At approximately the same time, Higgs began watching a movie with the victim. Higgs heard a knock on her front door and asked who was there but the mumbled response made it impossible for her to determine who was knocking. The knocking

continued. Higgs got off of the couch and unlocked the front door. The defendant was standing in the doorway holding a pistol.

The defendant did not say anything to Higgs but instead grabbed her by the neck and threw her against the wall of her apartment. He held his gun to Higgs's head and demanded to know where the "stuff" was. Higgs said, "Please don't do this, my baby is in the other room."[1] The victim then got up from the couch and moved toward the apartment's kitchen where the back door was located. The defendant, holding his gun in one hand and directing Higgs with the other, released Higgs and attempted to grab the victim's shirt. The victim turned to struggle with the defendant at which point the defendant fired a single round into the victim's neck from approximately one to two feet away.

This shot to the neck caused the victim to collapse instantly, although the medical examiner concluded that it was not the cause of death. The victim collapsed with the left side of his face on the floor. The victim was lying wounded, bleeding profusely, and was not an immediate threat to the defendant. The defendant, however, stepped over the victim, straddled his prone body, and fired a second shot into the back of the victim's head.

After firing the second, fatal, shot, the defendant stooped to pull money and drugs from the victim's pockets. While the defendant was examining the victim's pockets, Higgs's fiancé began screaming from the couple's bedroom. The defendant ran into the bedroom, waved and pointed his gun at Higgs's fiancé and their daughter, and told the fiancé to keep his mouth shut. Taking advantage of this distraction, Higgs fled the apartment and hid behind a neighboring building. The defendant then left the apartment and the area.

Having seen the defendant depart, Higgs returned to the apartment. Stark, who had been in the kitchen at the time of the shooting, informed Higgs that her fiancé had taken their daughter from the apartment through the back door. Higgs and Stark then discussed the repercussions if contraband were found on the

---

[1]This statement is drawn from Higgs's testimony. Stark, who remained connected with Higgs's apartment after G-Money's departure, was in the kitchen when the defendant, who was referred to by his street name "Half," knocked on the door. Stark testified that Higgs said, "Half, don't do it, my baby is here."

victim's body in Higgs's apartment, prompting Higgs to search the victim's pockets for drugs and money that the defendant may have left. She handed what she found to Stark. Higgs and Stark then left the apartment and Higgs telephoned the police on Stark's cellular telephone. North Adams police officers and a Massachusetts State trooper arrived and secured the scene. On entering the apartment police discovered a loaded handgun lying on the floor beside the victim.

The defendant went to the home of Theresa Iberra and John Ceasar with whom he was friendly. Before the defendant arrived, Iberra had learned while listening to a police scanner that police were looking for the defendant regarding the killing. She received a telephone call from the defendant asking that he be let in to her apartment. Before Iberra could open the door the defendant forced it open. The defendant told Iberra and Ceasar that he had entered Higgs's apartment, held a gun to Higgs, that the victim had begun walking toward him, that he believed the victim was going to shoot him, that he had shot the victim in the throat, that the victim had fallen face down on the floor, and that he had then shot the victim a second time in the back of the head. The defendant told Iberra that he was motivated by the fact that "they were making the money and he wasn't." The defendant also told Iberra that he wished he had shot another member of the Bloods rather than the victim whom he made no mention of having met before. While they talked, the defendant showed his pistol to Iberra and Ceasar and informed them that, because they were now witnesses to his confession, he was going to have to kill everyone in their family. When asked about this threat to her family, Iberra testified that the defendant insisted, "There will be no witnesses" and that as a result, "Everyone must die."

After calming down somewhat, the defendant slept at Iberra's house and was awake later in the morning when North Adams police arrived for purposes of interviewing Iberra. Iberra answered the door and informed police that the defendant was in a rear bedroom with her son. The defendant, who had fled through a window, was found beneath the porch of a neighboring building. Two days after arresting the defendant, North Adams police returned to Iberra's home to investigate the premises further and

discovered, written on the screen of Iberra and Ceasar's television, a message reading in part, "You all die, bitch."

The jury found the defendant guilty of murder in the first degree on theories of both deliberate premeditation and felony-murder. The predicate felony for felony-murder was the armed home invasion. The jury also convicted the defendant of armed home invasion and unlawful possession of a firearm while acquitting on charges of assaulting Higgs's daughter and fiancé by means of a dangerous weapon and intimidation of the fiancé.

2. *Insufficiency of indictment.* The defendant was indicted on a single charge of armed home invasion. The indictment specified that the charged offense occurred in North Adams on July 25, 2006, but did not identify the victim or the home. At trial the prosecutor presented evidence tending to show that the defendant (1) knowingly entered the dwelling places of both Higgs and Iberra; (2) knew that one or more persons were present within those dwelling places; (3) was armed with a handgun when so entering; and (4) used force against Higgs and threatened to kill the occupants of Iberra's apartment. See *Commonwealth v. Smith,* 458 Mass. 1012, 1013 (2010), quoting *Commonwealth v. Doucette,* 430 Mass. 461, 465-466 (1999) (elements of armed home invasion). Following the close of the Commonwealth's case the defendant moved for a required finding of not guilty due to the failure of the indictment to specify the offense for which the defendant was charged. The motion was denied and the defendant subsequently was found guilty of armed home invasion. The defendant has raised the issue on appeal.

This court previously considered this issue in *Commonwealth v. Barbosa,* 421 Mass. 547 (1995). In that case the Commonwealth presented a grand jury with evidence of two separate transactions occurring on the same day, either of which might have constituted the distribution of cocaine. *Id.* at 550. The grand jury returned only one indictment that failed to specify the transaction charged. *Id.* Despite the defendant's duplicity objection, the trial jury were presented with evidence of both transactions and found the defendant guilty of distributing cocaine. *Id.* at 549. The court held that, because "there is a substantial risk that the defendant was convicted of a crime for which he was not indicted by a grand jury," the defect in the

indictment required reversal of the conviction. *Id.* at 554. This case is indistinguishable.

"Article 12 [of the Massachusetts Declaration of Rights] requires that no one may be convicted of a crime punishable by a term in the State prison without first being indicted for that crime by a grand jury."[2] *Id.* at 549. Here, the grand jury were presented with evidence sufficient to charge the defendant with armed home invasion of both apartments but returned only one indictment that did not specify the apartment or the victim.[3] The trial jury were then presented with similar testimony that could have supported convictions of armed home invasion as to both incidents. Due to the ambiguity in the indictment there is thus "a substantial risk that the defendant was convicted of a crime for which he was not indicted by a grand jury." *Barbosa, supra* at 554. That is, we cannot be certain that the defendant was not indicted regarding his actions at Iberra's home but convicted for his actions at Higgs's home.

The Commonwealth argues that there is, in fact, no ambiguity as to the incident that was charged because the grand jury returned a felony-murder charge and must, according to this argument, have intended to charge the defendant with the predicate offense of armed home invasion of Higgs's apartment. "An underlying but uncharged felony," however, "may serve as the basis for a felony-murder conviction," so the felony-murder indictment does not serve to specify the particular incident contemplated by the grand jury.[4] *Commonwealth* v. *Smiley*, 431

---

[2]Article 12 of the Massachusetts Declaration of Rights states, in relevant part: "No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him . . . ." In interpreting this language, Chief Justice Shaw concluded that:

> "The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty." *Jones* v. *Robbins*, 8 Gray 329, 344 (1857).

[3]The grand jury minutes shed no light on the matter.

[4]For the same reason, the defendant is incorrect in arguing that, without the armed home invasion charge, there is no predicate offense on which to base a felony-murder conviction.

Mass. 477, 491 (2000), quoting *Commonwealth* v. *Eagles*, 419 Mass. 825, 839 n.16 (1995). The judge's instruction on both armed home invasion and on the predicate felony for felony-murder limited the armed home invasion charge to the incident at Higgs's apartment in which the victim was killed. This instruction, however, cannot correct the ambiguity in the indictment as the intent of the grand jury remains unclear. See *Barbosa, supra* at 552 (unanimity instruction that limited consideration to one of two incidents did not cure duplicity problem). Constitutional error of this sort does not permit harmless error analysis and, accordingly, we reverse the defendant's conviction of armed home invasion. *Barbosa, supra* at 554, and cases cited.

The jury instruction provided by the judge did, however, prevent the remainder of the trial from being tainted. By focusing the jury's consideration on the incident at Higgs's apartment, the judge removed any doubt that the jury convicted the defendant of felony-murder on an appropriate predicate offense — armed home invasion of Higgs's apartment. Reversing the conviction on the indictment charging armed home invasion thus does not disturb the defendant's conviction of felony-murder.

3. *Improper admission of threat evidence.* At trial the judge admitted, over the defendant's objection, evidence of the threat written on Iberra's television screen. The Commonwealth has made no suggestion that the threat was written by the defendant prior to being taken into custody or with his knowledge after his arrest. We review the admission of the threat evidence under the prejudicial error standard. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

The defendant argues that the threat was admitted to show consciousness of guilt despite the lack of any linkage between the maker of the threat and the defendant who was in police custody when the threat was made. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 267 (1989) (threats made by third parties should not be admitted for purposes of showing consciousness of guilt absent linkage to defendant). There is no suggestion in the record, however, that the threat was admitted for this purpose. Instead, the Commonwealth offered evidence of the threat to show gang involvement and rivalry that were part of the general milieu in which the defendant was operating and that might

have contributed to the defendant's motives, particularly where there was no evidence of personal tensions or antagonism between the defendant and victim. The judge accepted this purpose but the defendant argues that there was insufficient foundation demonstrating gang animosity or gang involvement in the drug businesses operated from Higgs's apartment. The defendant is incorrect.

The Commonwealth introduced evidence that a succession of gang members stayed at Higgs's apartment for short periods of time, operating transient drug businesses from the premises. The defendant lived in Higgs's living room for three weeks with, in Higgs's words, "just . . . a few clothes" before being thrown out and replaced by G-Money, a member of a rival gang. At the time the defendant departed from Higgs's apartment, Stark and G-Money were living in Schenectady, New York. Stark had not met Higgs but she and G-Money drove from New York State to a hotel parking lot in North Adams where G-Money made a telephone call that Stark interpreted as providing further directions. Stark and G-Money then walked to Higgs's apartment where they immediately settled and opened up a drug business. Within days of G-Money's departure, he was replaced by the victim, a fellow gang member who took up the drug business in Higgs's apartment. This sequence of events would have allowed the jury to draw a reasonable inference of organized drug activity by gang members.

Evidence of gang rivalry was also introduced. Higgs and her niece both testified that a member of the Crips stealthily entered Higgs's apartment for purposes of attacking a Blood, G-Money, who recently had arrived from out of State to supplant a Crip, the defendant, in that location. There also was testimony from Iberra that the defendant, a Crip, threatened to shoot her and that she interpreted this as an "obvious" reaction to the fact that she had been "making money for the Bloods" by selling drugs on their behalf.[5] Iberra also reported that the defendant expressed to her his regret that he had killed the victim instead of another Blood for whom Iberra had sold drugs "before [a Crip] came along." The Commonwealth thus clearly had established the

---

[5]This threat appears to be independent of the threat made by the defendant to kill Iberra, Ceasar, and their family so that "[t]here will be no witnesses."

existence of gang involvement in the drug business operating from Higgs's apartment and the existence of substantial tensions between gang members relating to that business. There was significant evidence that the defendant and the victim were both involved in the gang and drug activity. The threat evidence was properly placed in this context as an incident illustrating ongoing gang tensions. This evidence of gang rivalry, as opposed to individual antagonism, provided a motive to kill and an explanation for what otherwise might be seen as an inexplicable act of violence. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1982).

Aside from the existence of a factual basis for admitting the evidence, the defendant argues that the threat was so inflammatory as to overwhelm any possible probative value. Specifically, the defendant argues that it portrays him as a violent gang member who carried out gang orders to sell drugs and to murder competitors. We disagree because the danger of any unfair prejudice is minimal while the threat had significant probative value. See Mass. G. Evid. § 403 (2010) ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .").

The danger of unfair prejudice to the defendant was minimal because the Commonwealth made no suggestion at trial that the defendant personally was involved in the issuance of the threat. Considering that the defendant was in custody at the time the threat was made, it is unlikely the jury would have held the threat itself against the defendant. As regards the potentially inflammatory nature of gang involvement, other evidence clearly linked the defendant to the Crips gang that had been associated with at least one violent incident at Higgs's apartment. More importantly, evidence of a threat to Iberra relating to her testimony is unlikely to have caused unfair prejudice because the jury had already heard Iberra and Ceasar's testimony that the defendant himself, while seated in their kitchen with a loaded revolver, threatened to kill them and their children so as to remove witnesses to his confession. That evidence was considerably more inculpatory. In light of all the circumstances, we conclude that admission of the threat did not unfairly prejudice the defendant and there was no error in admitting it in evidence.

4. *Erroneous jury instructions.* The defendant asserts that the judge provided the jury with erroneous instructions regarding the use of excessive force in the course of self-defense. In this argument the defendant relies on our holding in *Commonwealth v. Santos*, 454 Mass. 770 (2009). In that case, decided after the trial in this case, we expressed concern that the jury instructions "effectively informed the jury that, if a defendant otherwise entitled to defend himself uses excessive force, he loses the right of self-defense altogether." *Id.* at 774. We ruled that such an instruction was erroneous and required reversal because, "we cannot discern from the verdict whether the jury returned a verdict of murder because they rejected the defendant's assertion of self-defense altogether, or because they had been led to believe that excessive force in self-defense permitted a murder finding." *Id.* The defendant argues that the instructions here were similarly erroneous.

We need not reach the question here, however, because the jury found that the defendant was guilty of murder in the first degree on theories of both deliberate premeditation and felony-murder. Self-defense is inapplicable to a charge of felony-murder so any error in the self-defense and excessive force instructions would have had no impact on felony-murder deliberations. See *Commonwealth v. Pagan*, 440 Mass. 84, 91 (2003) (in case involving armed home invasion, "the defendant and his companions were the intruders and instigators of the deadly confrontation, and thus cannot claim self-defense"); *Commonwealth v. LePage*, 352 Mass. 403, 419 (1967) (manslaughter instruction inappropriate because "there was no evidence upon which the jury could find the defendants were not engaged in the commission of a felony when the killing occurred"). Because we affirm the murder conviction on the theory of felony-murder, we need not address the question whether the conviction on the theory of deliberate premeditation was also proper. *Commonwealth v. Nolin*, 448 Mass. 207, 220 (2007), citing *Commonwealth v. Chipman*, 418 Mass. 262, 270 n.5 (1994) ("If a jury return a guilty verdict based on two theories [of murder in the first degree], the verdict will remain undisturbed even if only one theory is sustained on appeal"). We therefore decline to address this argument.[6]

---

[6]Similarly, because we uphold the defendant's conviction of murder in the first degree on the theory of felony-murder, we decline to address the defend-

5. *Ineffective assistance of counsel.* In his motion for a new trial, the defendant argued that he was denied the effective assistance of counsel because (a) counsel inappropriately dissuaded him from testifying; (b) counsel failed to establish and argue that physical evidence rendered the Commonwealth's theory of the case impossible; and (c) counsel did not call an important defense witness. In his direct appeal the defendant raises the additional claim that trial counsel was ineffective in failing to request a provocation instruction.

"In considering issues argued on direct appeal as to which the defendant's appellate rights were not preserved by an objection or some other manner, we apply the standard of G. L. c. 278, § 33E. We must decide whether there is a substantial likelihood that a miscarriage of justice has occurred." *Commonwealth v. Wright*, 411 Mass. 678, 681 (1992). "[A]ssertions of unpreserved error offered as the basis of a claim of ineffective assistance of counsel in a motion for a new trial are evaluated in the case of murder in the first degree under a substantial likelihood of a miscarriage of justice standard." *Commonwealth v. Bly*, 444 Mass. 640, 648 (2005). The same standard applies regardless of the procedural pathway. "In reviewing each claim of the ineffectiveness of trial counsel, therefore, we shall consider whether there was an error in the course of the trial . . . and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth v. Wright, supra* at 682.

(a) *Loss of right to testify.* The defendant argues that he was deprived of his constitutional right to testify in his own defense.[7]

---

ant's assertion that the jury instruction regarding manslaughter was incorrect. See *Commonwealth v. Tu Trinh*, 458 Mass. 776, 783 (2011) (describing manslaughter instruction); *Commonwealth v. Nolin*, 448 Mass. 207, 220 (2007).

[7] The defendant's discussion interweaves arguments relating to the effectiveness of counsel with arguments addressing the voluntariness of his waiver of the right to testify. To the extent that incorrect advice from counsel might preclude a voluntary waiver of the right to testify, the issues are interconnected and we analyze them under both theories. "Where a claim of ineffective assistance of counsel is raised in the motion [for a new trial], and where the appeal from the denial of the motion is heard with the direct appeal under G. L. c. 278, § 33E, as here, we review to determine whether any conduct or omission by counsel 'was likely to have influenced the jury's consideration.' " *Commonwealth v. Sharpe*, 454 Mass. 135, 146-147 (2009), quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992).

Specifically, the defendant asserts that he wished to testify but was dissuaded when counsel caused him to believe that the prosecutor would prevent him from telling his story at trial. The defendant also asserts that counsel left him with the understanding that his decision not to testify was not final and would permit him to seek reversal of any conviction.

"The right to testify on one's own behalf in a criminal case is fundamental." *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000). "A right fundamental to a fair trial must be waived knowingly and intelligently." *Commonwealth* v. *Smith*, 456 Mass. 476, 480 (2010), citing *Commonwealth* v. *Santos*, 402 Mass. 775, 783 (1988). When asserting that errors of counsel deprived him of the right to testify, "[a] defendant has the burden of proving that his waiver of his right to testify was invalid." *Commonwealth* v. *Lucien*, 440 Mass. 658, 671 (2004), citing *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 641-642 (1990). "It is not enough to say that counsel had discouraged him from testifying." *Commonwealth* v. *Lucien, supra.*

In support of his motion for a new trial the defendant submitted his own affidavit stating that he was not made aware of the opportunity to testify on direct examination, was advised that the prosecutor could prevent him from telling his version of events, was left with the impression that he could reverse his decision not to testify if he were convicted, and was not informed that his testimony might be necessary to establish facts in support of certain defense theories. Regarding the actual advice provided, the defendant's affidavit does not differ materially from the affidavit provided by his thorough and highly experienced attorney. The motion judge, who was also the trial judge, found the defendant's self-serving affidavit to be noncredible. See *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 103 (2004) ("We afford special deference to factual findings where, as here, the motion judge also presided over the defendant's trial").

We agree with the ruling on the motion for a new trial that the defendant has not met his burden of proof. Regarding the defendant's postconviction rights, we note that the advice that trial counsel recalls offering and the advice that the defendant recalls receiving are the same. It is only the defendant's purported misunderstanding of that advice, that waiving his right to testify

would permit him a "do over" on conviction, that is not supported by trial counsel's affidavit. This interpretation of the advice provided is unreasonable and does not suffice to meet the defendant's burden of proof.

The defendant also reports that counsel caused him to believe that he would not be permitted to tell the jury his version of the incident. Trial counsel reports, however, that he merely advised the defendant that his testimony could encounter credibility problems and that cross-examination would require the defendant to answer specific questions rather than permitting the defendant to "re-tell his story." We defer to the judge's finding that the defendant's affidavit is noncredible and conclude that the defendant's unreasonable interpretation of this advice does not suffice to meet his burden of proof.

We turn to the defendant's related argument, advanced in his direct appeal, that he was provided with incorrect advice by counsel regarding his right to testify. See note 8, *infra.* As discussed above, we find no error in the advice offered by counsel and conclude that the defendant has not shown a reasonable misunderstanding of that advice.

Regarding counsel's strategic and tactical decisions as to the benefits and risks of placing the defendant on the witness stand we have held that counsel's strategic decisions, including advising a defendant not to testify, do not amount to ineffective assistance of counsel unless they are "so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.' " *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978). See *Commonwealth* v. *Bell,* 455 Mass. 408, 421 (2009) ("A strategic decision by counsel will be deemed constitutionally ineffective only if it was manifestly unreasonable at the time it was made"). We conclude that the decision to advise the defendant not to testify was not manifestly unreasonable.

The defendant reports that he would have provided testimony to the effect that he was invited into Higgs's apartment, did not assault Higgs, and accordingly was not in the process of committing an armed home invasion when he shot the victim. Further, the defendant reports that he would have testified that, while in the apartment, he saw the victim walking toward him quickly with a drawn gun and was therefore justified in responding with

two rapid shots delivered while the victim still posed a threat.[8] If the jury had credited this testimony, the defendant could not have been found guilty of felony-murder and the excuse of self-defense would have been available regarding deliberate premeditation. Trial counsel reports that he had concern regarding the likelihood that the jury would find this explanation of events credible.

Trial counsel's concern was well founded considering that the defendant's version of events would require the jury to disbelieve the testimony of two percipient witnesses, Higgs and Stark, whose testimony suggested a violent entrance to the apartment. The defendant's version of events would also require the jury to (a) believe that the victim drew a gun on the defendant although the defendant had done nothing to threaten anyone with the imminent use of force; (b) believe that the victim threatened the defendant with a drawn and operational gun yet the defendant was able to access and fire his weapon before the victim could respond; and (c) reconcile the defendant's claim of rapid defensive shooting with physical evidence that bullets from the defendant's weapon passed through the victim's body in opposite directions (left to right across the neck and right to left through the skull) and at different angles (horizontally across the neck, from the base to the brow of the skull). In addition, the defendant's testimony was subject to impeachment with his own prior inconsistent statements to Ceasar and Iberra and with his prior convictions. The defendant's testimony also could have opened the door to cross-examination regarding, inter alia, the defendant's business activities in Higgs's apartment, his acquisition of an unlicensed firearm, his discussion with the Dunkin' Donuts clerk, his flight from the scene, and his flight from Iberra's apartment. Considering the benefits to be gained from introducing the defendant's problematic testimony, the risks associated with placing him on the stand, and the fact that the basis for a self-defense instruction had already been established through the

---

[8]We evaluate the reasonableness of counsel's strategic decision to advise against testifying "at the time it was made." *Commonwealth* v. *Bell*, 455 Mass. 408, 421 (2009), citing *Commonwealth* v. *Adams*, 374 Mass. 722, 728-730 (1978). While this testimony would have gone to the question of self-defense that we decline to address on this appeal, see *supra* at 548, the question may remain relevant in considering the effectiveness of counsel.

testimony of Iberra, we conclude that it was not manifestly unreasonable for trial counsel to have advised that waiver of the right to testify was the wiser course. See *Commonwealth* v. *Bell, supra*; *Commonwealth* v. *Adams, supra*. There was no error.

(b) *Sufficiency of the evidence.* The defendant asserts that counsel failed properly to marshal physical and forensic evidence that would have demonstrated the impossibility or implausibility of the Commonwealth's theory of the case. Relying on this alleged impossibility, the defendant also asserts that there was insufficient evidence to support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). Specifically, the defendant argues that the range at which the shot to the neck was fired and the path of the fatal bullet are both inconsistent with the Commonwealth's version of events. These arguments are without merit.

Evidence was presented that the defendant grabbed the victim when the victim began moving toward the rear door of the apartment, that the defendant and the victim struggled, and that the defendant attempted to grab the victim's shirt with one hand before shooting him. This testimony is not inconsistent with the medical examiner's opinion that the shot to the neck was fired from somewhere between eighteen and twenty-four inches from the victim's neck. Given the struggle, the possibility that the victim was attempting to flee, and the possibility that the victim was at a shirt's-length from the defendant's outstretched hand, this distance does not render the Commonwealth's theory implausible let alone impossible.

The defendant similarly argues that the angle of the fatal shot precludes the Commonwealth's theory. According to the defendant's theory on appeal, the fact that the fatal bullet did not travel directly down through the victim's skull disproves the Commonwealth's theory that the fatal shot was fired while the defendant straddled the victim's body. A right-handed individual such as the defendant, standing over the legs or feet of the victim who lay face down could well have fired a shot that passed from the right base to the left brow of the victim's skull. The geometric impossibility asserted by the defendant on appeal is not viable.[9] There was thus no error in failing to pursue this

---

[9] In his motion for a new trial the defendant argued that a ballistics expert

argument and, accordingly, there is no substantial likelihood of a miscarriage of justice. See *Commonwealth v. Williams*, 453 Mass. 203, 204-205 (2009). Further, viewed in a light most favorable to the Commonwealth, the evidence is sufficient to support the Commonwealth's version of events. See *Commonwealth v. Latimore, supra.*

(c) *Failure to call an exculpatory witness.* The defendant asserts that counsel was ineffectual in defending against the armed home invasion charge. We addressed those arguments relating to the evidence the defendant might have offered had he testified. The defendant also contends, however, that trial counsel should have called Daniel Chao to testify regarding the defendant's motives for carrying a firearm. On appeal we consider whether trial counsel's decision not to call Chao was "so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.' " *Commonwealth v. Adams*, 374 Mass. 722, 728 (1978). See *Commonwealth v. Williams, supra*, citing *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974) (in cases of murder in first degree we consider possibility of ineffective assistance of counsel even though *Saferian* standard may not be met). We conclude that counsel did not breach this standard in failing to call Chao.

Based on Chao's statement to police, the defendant asserts that Chao would have testified that there had recently been a violent altercation between members of the Bloods and the Crips at Chao's home, that the defendant had been involved in the altercation, that the defendant had later shown a firearm to Chao, and that the defendant had repeatedly told him he carried the weapon for purposes of self-defense. The defendant argues that this evidence, arguably admissible as a statement of present intent, would have provided the jury with an alternative explanation for the fact that the defendant was armed when he arrived at Higgs's house. See Mass. G. Evid. § 803(3)(B)(i) (2010). Rather than being indicative of an intent to commit a violent crime, the defendant argues that his decision to carry a weapon might have been portrayed as a measure taken in self-defense.

should have been called to illuminate this defense theory as well as others relating to the defendant's and victim's weapons. In his ruling the judge ably expressed the reasons why such testimony would not have availed the defendant and the claim is not pressed further on appeal.

This evidence would have been far weaker, however, than the intent evidence presented by the Commonwealth. Chao could have testified only to the defendant's expression of a general intent in carrying a weapon that was made several days before the home invasion. In contrast, the Commonwealth presented more probative evidence of the defendant's intent at moments immediately before, during, and after the crime. First, the Commonwealth presented testimony that, only minutes before he went to Higgs's apartment, the defendant was agitated and engaged a Dunkin' Donuts employee in a discussion about the likely response to a shooting in North Adams. Second, Higgs and Stark both testified that, on entering the apartment, the defendant's immediate act was to assault Higgs. Finally, Iberra testified that, within hours after he shot the victim, the defendant expressed his frustration at being excluded from the profitable drug trade operated from Higgs's apartment. These indications of intent were all more proximate to the event than anything to which Chao could have testified and spoke directly to the defendant's intent in visiting Higgs's apartment rather than to the general purpose for which the defendant carried a firearm.

Against the minimal benefits of the proposed intent evidence, trial counsel was required to weigh the risks of calling Chao as a witness. Most important, the prosecution would have been able to cross-examine Chao regarding his statement to police that the defendant had sought to hide in Chao's house the morning after the shooting. This testimony would have provided significant consciousness of guilt evidence against the defendant. Cross-examination of Chao also would have elicited further evidence of drug-related violence between the Bloods and Crips street gangs and would have directly implicated the defendant in such activity.[10] Chao also could have been asked about the defendant's attempts to secure a shotgun several days before the shooting. While these attempts might have been ascribed to the defendant's general concern regarding the Bloods, they would

[10]The defendant argues that Chao would actually have testified that this was a romantic dispute. The police summary of Chao's statement provides, at best, minimal support for this proposition. Even if the defendant is correct, Chao's explanation of events would have required discussion of a dispute regarding the weight of marijuana purchased by the defendant with the gang and drug overtones of the dispute being clear to the jury.

have strengthened the jury's impression of the defendant as a man deeply involved in violent activity.

Considering the risks inherent in calling Chao to testify and the minimal value of that testimony, we cannot conclude that the decision not to call Chao was manifestly unreasonable and we find no error "likely to have influenced the jury's conclusion." *Commonwealth* v. *Williams, supra* at 205, quoting *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

(d) *Failure to request a provocation instruction.* In his direct appeal the defendant argues that counsel should have sought a provocation instruction in addition to the self-defense instruction. The defendant's theory is that, if the jury concluded that the second shot was fired after the need for self-defense had passed, an excuse of provocation would still have permitted the return of a voluntary manslaughter conviction. See *Commonwealth* v. *Hinds,* 457 Mass. 83, 89-90 (2010) (addressing voluntary manslaughter and reasonable provocation). Provocation is relevant to deliberate premeditation but is not germane to felony-murder. See *Commonwealth* v. *Rolon,* 438 Mass. 808, 823 (2003) ("While provocation resulting in a heat of passion would operate to negate malice, it is not germane to felony-murder, where malice need not be shown. . . . Evidence of provocation would not in any sense detract from evidence that the defendant committed the predicate felony and is not a proper basis on which to reduce a conviction of felony-murder"). Because we uphold the conviction on the theory of felony-murder, we need not address this issue. See *Commonwealth* v. *Nolin,* 448 Mass. 207, 220 (2007).

6. *Denial of evidentiary hearing on motion for a new trial.* The defendant argues that the judge erred in deciding his motion without first holding an evidentiary hearing. "There is no constitutional error in deciding the motion for a new trial on affidavits" and this court has held that the question whether to hold an evidentiary hearing is "left largely to the sound discretion of the judge." *Commonwealth* v. *Stewart,* 383 Mass. 253, 257, 259 (1981). See *Commonwealth* v. *DeVincent,* 421 Mass. 64, 69 (1995). An evidentiary hearing is required only where a "substantial issue" has been raised and, "[i]n determining whether a 'substantial issue' meriting an evidentiary hearing . . . has been raised, we look not only at the seriousness of the

issue asserted, but also to the adequacy of the defendant's show-ing on the issue raised." *Commonwealth* v. *Stewart, supra* at 257-258.

Denial of the constitutional right to testify and of the right to adequate representation by counsel is a serious issue. The affi-davits presented by the defendant, however, do not make a substantial showing regarding the potential denial of the defend-ant's right to testify. Similarly, the showing made by the defendant regarding the remaining issues was not sufficient to have required the judge to hold an additional evidentiary hearing before ruling. Accordingly, we find no abuse of discretion.

7. *G. L. c. 278, § 33E.* We have reviewed the entire record, the briefs, the arguments, and all the issues. We conclude there is no reason to reduce the degree of guilt or order a new trial pursuant to our power under G. L. c. 278, § 33E.

8. *Conclusion.* The judgment of conviction on the indictment charging armed home invasion is reversed. The judgments of conviction on the indictments charging murder and illegal pos-session of a firearm are affirmed. The denial of the defendant's motion for a new trial is affirmed.

*So ordered.*